581 P.2d 784

**Raymond W. CLARK and Iona Clark, husband and wife, dba Clark's Custom Farming, Plaintiff-Respondent and Cross-Appellant,**

v.

**INTERNATIONAL HARVESTER COMPANY, a Delaware Corp., Defendant-Appellant and Cross-Respondent,**

**and**

**McVey's, Inc., an Idaho Corp., Defendant.**

No. 12328.

Supreme Court of Idaho.

June 30, 1978.

Richard E. Hall and Loren Ipsen of Moffatt, Thomas, Barrett & Blanton, Boise, for defendant-appellant and cross-respondent.

Randy John Stoker of Plankey, Johnson, Kvanvig & Stoker, Twin Falls, for plaintiff-respondent and cross-appellant.

BAKES, Justice.

This is a products liability case in which the plaintiffs seek to recover consequential damages for economic losses resulting from an allegedly defective tractor manufactured by defendant International Harvester Company and sold to the plaintiffs by defendant McVey's, Inc., an International Harvester Co. dealer. The plaintiffs alleged a breach of implied and express warranties and negligent design and manufacture of the tractor. Prior to trial the district court granted partial summary judgments in favor of the defendants on the warranty claims. After trial the district court, sitting without a jury, entered judgment against the defendants on the negligence claim and awarded the plaintiffs $26,950.15 in damages.

The defendant International Harvester Co. appeals from that judgment on several grounds. The plaintiffs have cross appealed from the partial summary judgments which dismissed their warranty claims.

We reverse with respect to the defendant's appeal on the negligence claims, and reverse and remand with respect to the plaintiffs' cross appeal on the denial of the warranty claims.

I

Plaintiff Raymond W. Clark is a custom farmer in the Twin Falls, Idaho, area doing business as Clark's Custom Farming. Custom farmers contract to plow or preplant (a fertilizer application) farmland and are generally compensated according to the number of acres plowed or preplanted. They generally work intensive 10 to 15 hour work days, but work only during the spring and fall. In the spring of 1972 Clark first engaged in the custom farming business in the Twin Falls area, although he previously had been in the custom farming business in California.

On January 7, 1972, Clark purchased a Model 1466 International Harvester turbodiesel tractor from McVey's, Inc. Clark took delivery of the tractor on January 28,

1972, The transmission of this tractor was equipped with a "torque amplifier" (TA). When the tractor is driven in the TA mode, as opposed to the direct or normal drive mode, the tractor develops more torque, or pulling power, at a sacrifice of speed. Clark began using the tractor in his custom farming business in March, 1972. However, between April, 1972, and May, 1973, several breakdowns because of bent or broken push rods in the engine occurred. After each breakdown, McVey's repaired the tractor free of charge under the warranty. Because of these breakdowns Clark alleged he lost 11½ days of work.

Early in the fall of 1973, more than a year and a half after he had purchased the tractor, Clark noticed a loss of power in the tractor while preplanting a field covered with potato vines, weeds and other debris. The debris in the field piled up in front of the shanks of the preplant applicator, rather than feeding back through the shanks of the applicator. Preplanting was impossible under these conditions. Clark believed this problem was caused by the inability of the tractor to pull the applicator with sufficient speed to vibrate the shanks of the applicator and thereby cause the debris to feed back through the shanks. McVey's tested the tractor on a dynamometer, a device for testing the horsepower of a tractor at the power takeoff (PTO) shaft. That test revealed no significant loss of horsepower at the PTO shaft.

Nonetheless, Clark believed the tractor was not pulling properly and concluded that the tractor was not able to plow a sufficient number of acres per hour for it to be economically practical to operate the tractor that season. Clark investigated the possibility of renting a substitute tractor for the 1973 fall season, but determined that it would be too expensive. With the exception of the first fall plowing job during which he experienced the loss of power, Clark did not do any custom farming with the tractor in the fall of 1973.

Clark testified that if the tractor had been functioning properly he would have been able to work sixty ten-hour work days

that fall—approximately 40 days plowing and 20 days preplanting. Earlier in 1973, Clark had signed a three year contract with United States Steel Farm Service for fertilizer application. A representative of that firm testified that his company could have supplied Clark with 60 days of work in the 1973 fall season.

Because field conditions were better in the spring of 1974, Clark was able to operate the tractor on a limited basis for 14 days, but at a slower speed than he had operated the tractor previously. At the trial Clark testified that he was only able to cover eight acres per hour when he felt he should have been able to cover twelve acres per hour.

In December of 1973, Clark, through his attorney, had contacted Dr. Rudolf Limpert, an associate research professor of mechanical engineering at the University of Utah. Dr. Limpert agreed to examine the tractor and try to diagnose the cause of the power loss. Over the next six months Dr. Limpert conducted several tests on the tractor. From these several tests Dr. Limpert concluded that something was slipping in the process of transmitting the power from the engine to the draw bar in the TA mode. Under Dr. Limpert's supervision the TA unit was disassembled at a tractor repair shop in Twin Falls, Idaho. Upon disassembly Dr. Limpert noted eccentric wear in a clutch shaft. Under Dr. Limpert's direction, the TA unit was replaced by the repair shop with parts obtained from McVey's. Dr. Limpert tested the tractor after repair and determined that it was performing satisfactorily.

Clark sued McVey's and International Harvester in October, 1974, alleging negligent design and manufacture and breach of implied and express warranties. McVey's cross claimed against International Harvester for indemnification.

The defendants separately moved for summary judgment alleging that when Clark purchased the tractor he signed a sales form which provided for a 12 month warranty and which limited the buyer's remedies to the repair or replacement of

defective parts by the defendant and disclaimed all other warranties. The trial court granted the motion for summary judgment on the warranty claims but ruled that the disclaimer provisions in the form did not exclude liability for negligence.

A court trial was held on the negligence claim. Defendant McVey's did not participate in the trial.[1] Dr. Limpert, testifying as an expert witness for the plaintiffs, stated that the eccentric wear on the clutch shaft in the TA assembly permitted oil to escape between the shaft and its housing. According to Dr. Limpert, this oil leakage resulted in a decrease in the hydraulic pressure which permitted slippage between the clutch plates of the TA lockup clutch, which is hydraulically actuated, because the hydraulic pressure was then insufficient to squeeze the plates together properly. The plaintiffs also introduced evidence that the push rod failures were caused by improperly designed rocker arms and that International Harvester should have detected the problem in its inspection and products control system.

After the plaintiffs had rested their case, the defendant moved for a dismissal on the ground that the plaintiffs had only established consequential damages and that purely consequential damages were not recoverable in negligence. The trial court denied the motion.

William R. Borghoff, a product performance engineer for International Harvester, testified about the operation of the TA assembly in Clark's tractor. According to Borghoff, the TA lockup clutch, which Dr. Limpert testified had been slipping, is a light duty clutch which prevents the tractor from coasting when driven in the TA mode, and it transmits no power from the engine to the draw bar. According to Borghoff's testimony it would be mechanically impossible for slippage in the TA lockup clutch or low hydraulic pressure to cause a loss of horsepower in the TA mode. The plaintiffs presented no rebuttal evidence concerning the function of the TA lockup clutch or the manner in which power is transmitted in the TA mode.

In a memorandum opinion the trial court found that "[p]laintiffs' consequential damages due to 'down' time in their operation were caused by design defect in the valve train of the engine and negligent manufacture or assembly in the torque amplifier, . . . Plaintiffs are entitled to recover $24,246.00 for their down time and $2,112.00 for repair of the tractor."[2] The trial court denied the plaintiffs' claims for damages due to loss of "present and future" business and decreased value of the tractor. Formal findings of fact, conclusions of law and a judgment were subsequently prepared and entered.[3]

The defendant International Harvester made motions (1) for an amendment of the findings of fact and conclusions of law, pursuant to I.R.C.P. 52(b), (2) for a new trial pursuant to I.R.C.P. 59(a), and (3) for an amendment of the judgment entered pursuant to I.R.C.P. 59(e). All the defendant's motions were denied.

The defendant International Harvester has appealed from the judgment of the trial court and from the denial of its post trial motions. The plaintiffs have cross appealed

1. Clark had filed a covenant not to execute and an indemnification of hold harmless agreement between himself and McVey's. McVey's therefore did not participate in the trial.

2. The final judgment entered allowed an additional $592.15 for payments the plaintiffs had made to Twin Falls Tractor & Implement Company for repair of the TA assembly. The damages as itemized in the findings are as follows:

$2,722.00, lost profits due to push rod failures between April, 1972, and June, 1973;
$16,160.00, lost profits due to loss of power in fall of 1973;

$2,016.00, lost profits during spring of 1974 when Clark was able to use the tractor but on a limited basis and at a slow speed;
$3,348.00, lost profits during time Dr. Limpert was repairing the TA assembly;
$2,112.00, Dr. Limpert's fee for repairing the tractor;
$592.15, charges for the repair work by the tractor shop.

3. The judgment was entered against both defendants—McVey's and International Harvester—but McVey's was granted a judgment against International Harvester for the full amount of the total judgment.

from the partial summary judgments on their warranty claims.

## II

## APPEAL OF DEFENDANT INTERNATIONAL HARVESTER

The defendant on appeal has made numerous assignments of error. They can be summarized as follows:

1. The evidence adduced at trial is insufficient to support the trial court's finding that the alleged loss of horsepower was caused by an improperly manufactured shaft in the TA assembly.

2. There was no showing that the alleged defect in the TA assembly was the proximate cause of the damages claimed by plaintiffs.

3. The trial court erred in denying the defendant's post trial motions for a new trial and to amend the findings of fact and the judgment, and the trial court erred in refusing to allow the submission of demonstrative evidence in support of those motions.

4. The trial court erred in awarding consequential damages for purely economic loss in a tort action.

5. The trial court erred in ruling that the recovery of consequential damages for the defendant's negligence was not excluded by the contract between the parties.

6. The damages awarded the plaintiffs were speculative and conjectural, and the plaintiffs failed to mitigate their losses.

7. The trial court erred in awarding the plaintiffs the fees of Dr. Limpert as an item of damages.

We first consider assignment of error No. 4, which concerns the recovery of damages for economic loss in a negligence action, because, in our view, that is dispositive of the negligence issue. The specific question presented by this assignment of error is best demonstrated by distinguishing this case from those of our earlier and somewhat related cases. This case is not like *Shields v. Morton Chemical Co.*, 95 Idaho 674, 518 P.2d 857 (1974), in which the plaintiff sought damages for economic loss as a result of seeds which were damaged by the defendant's chemicals. In the instant case the plaintiffs have not alleged that their economic losses were the result of any property damage caused by the defendants. This case is not like *Rindlisbaker v. Wilson*, 95 Idaho 752, 519 P.2d 421 (1974), in which the plaintiff sought damages for profits lost as a result of a personal injury. In the instant case the plaintiffs have not alleged any personal injury. The negligence issue in this case is not like *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 97 Idaho 348, 544 P.2d 306 (1975), in which the plaintiffs sought damages for economic loss for breach of an implied warranty.[4] In that case we did not rule whether such damages were recoverable in a negligence action, but held that a plaintiff who was not in privity of contract with the defendant could not recover economic losses based on a breach of an implied warranty. In this case it is conceded that there is privity.

In this action the plaintiffs seek recovery only of lost profits due to alleged "down time" and the costs of repairing and replacing allegedly defective parts.[5] The instant case presents the very narrow question whether the purchaser of a defective product who has not sustained any property damage or personal injury, but only suffered economic losses, can recover those

4. In *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 97 Idaho 348, 544 P.2d 306 (1975), we ruled that damages for economic loss include "costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequential loss of profits or use." 97 Idaho at 351, 544 P.2d at 309. Accordingly, the damages sought by the plaintiffs in this action are for economic losses as we defined that term in *Salmon Rivers*. The plaintiffs do not seek recovery for property damages or personal injury.

5. In their complaint the plaintiffs also sought damages for loss in value of the tractor and for loss of business. These damages were denied by the trial court and plaintiffs have not appealed from that ruling.

losses in a negligence action against the manufacturer.

This Court has not previously considered this issue. The majority of jurisdictions which have considered the issue have not permitted the recovery of purely economic loss in a products liability action sounding in tort. *See Fredonia Broadcasting Corp. v. RCA Corp.*, 481 F.2d 781 (5th Cir. 1973) (applying Texas law to strict liability action); *Bright v. Goodyear Tire & Rubber Co.*, 463 F.2d 240 (9th Cir. 1972) (applying California law); *Southwest Forest Industries, Inc. v. Westinghouse Electric Corp.*, 422 F.2d 1013 (9th Cir. 1970), *cert. denied* 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970) (applying Arizona law to strict liability action); *Plainwell Paper Co. v. Pram, Inc.*, 430 F.Supp. 1386 (W.D.Pa.1977) (applying Pennsylvania law to strict liability action); *Arizona v. Cook Paint & Varnish Co.*, 391 F.Supp. 962 (D.Ariz.1975) (concluding that under the law of either Arizona, California, Hawaii, Texas or Alaska purely economic losses were not recoverable in strict liability or negligence actions), *aff'd* 541 F.2d 226 (9th Cir. 1976); *Cooley v. Salopian Industries, Ltd.*, 383 F.Supp. 1114 (D.S.C. 1974) (applying South Carolina law to strict liability action); *Morrow v. New Moon Homes*, 548 P.2d 279 (Alaska 1976) (strict liability); *Beauchamp v. Wilson*, 21 Ariz. App. 14, 515 P.2d 41 (1973) (strict liability); *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (strict liability); *Anthony v. Kelsey-Hayes Co.*, 25 Cal.App.3d 442, 102 Cal.Rptr. 113 (1972) (strict liability and negligence); *Hiigel v. General Motors Corp.*, 544 P.2d 983 (Colo. 1975) (strict liability); *Long v. Jim Letts Oldsmobile, Inc.*, 135 Ga.App. 293, 217 S.E.2d 602 (1975) (negligence); *Alfred N. Koplin & Co. v. Chrysler Corp.*, 49 Ill. App.3d 194, 7 Ill.Dec. 113, 364 N.E.2d 100 (1977) (negligence); *Rhodes Pharmacal Co. v. Continental Can Co.*, 72 Ill.App.2d 362, 219 N.E.2d 726 (1966) (strict liability); *Hawkins Construction Co. v. Matthews Co.*, 190 Neb. 546, 209 N.W.2d 643 (1973) (strict liability); *Avenell v. Westinghouse Electric Corp.*, 41 Ohio App.2d 150, 324 N.E.2d 583 (1974) (strict liability); *Price v. Gatlin*, 241 Or. 315, 405 P.2d 502 (1965) (strict liability); *Nobility Homes, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977) (strict liability). However, a small minority of jurisdictions allow the recovery of purely economic losses in strict liability actions. *See City of LaCrosse v. Schubert, Schroeder & Assoc., Inc.*, 72 Wis.2d 38, 240 N.W.2d 124 (1976); *Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602, 182 N.W.2d 800 (1970); *Santor v. A. & M. Karagheusian, Inc.* 44 N.J. 52, 207 A.2d 305 (1965).

Dean Prosser summarized this majority rule with respect to recovery of economic losses in a products liability case sounding in negligence as follows:

"There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself, as where an automobile is wrecked by reason of its own bad brakes, as well as damage to any other property in the vicinity. But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule, to be encountered later, that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery." W. Prosser, Handbook on the Law of Torts, § 101 at 665 (4th ed. 1971).

The Restatement (Second) of Torts, § 395 (1965), states that a manufacturer is to be liable for "physical harm" caused by its negligence in the manufacture of a chattel dangerous unless carefully made, but that Restatement section does not extend the manufacturer's liability to encompass purely economic loss.

Similarly, Restatement (Second) of Torts, § 402A (1965), which states the rule of strict liability in tort adopted by this Court in *Shields v. Morton Chemical Co., supra*, provides:

"One who sells any product in a defective condition unreasonably dangerous to the

user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property . . . ."

Like the Restatement section concerning the manufacturer's liability for negligence, § 402A does not extend a seller's tort liability to include purely economic losses.

One of the most fully articulated discussions of the considerations underlying this rule is found in Justice Traynor's majority opinion in *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), which we cited approvingly in *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co., supra.* In *Seely* the plaintiff sought to recover lost profits and a refund of the purchase price of a defective truck. The California Supreme Court ruled that such damages, although recoverable in a breach of warranty action, were not recoverable in strict liability in tort. The following passage from the majority opinion is pertinent to this case:

"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone. [Citations omitted]." 45 Cal.Rptr. at 23, 403 P.2d at 151.

We believe the rule advanced by the majority of the jurisdictions and by the Restatement is sound for the reasons articulated by Justice Traynor in *Seely*. Since the turn of the century the law of tort has undergone unprecedented change as courts have endeavored to adapt it so as to satisfy the demands of the commercial, marketing and manufacturing practices of this era. However, we recognize that the courts have not been alone in working to develop laws appropriate to the field of products liability. The legislature has enacted the Uniform Commercial Code. I.C. §§ 28–1–101 through –10–104. Chapter 2 of that act, I.C. §§ 28–2–101 through –2–725, contains a comprehensive and finely tuned statutory mechanism for dealing with the rights of parties to a sales transaction with respect to economic losses. In the continuing development of the tort law of this state, it is important that we be cognizant of the legislature's actions in this area. Indeed, *Santor v. A. & M. Karagheusian, Inc., supra,* the leading case for the view that purely economic losses should be recoverable in product liability cases sounding in tort, has been soundly criticized on this ground:

"It is striking that those who would use tort law to protect consumers in defective-product cases do so with only the most cursory explicit recognition that there may already be a body of law directed toward regulating the rights of buyers and sellers, and a statutory body at that. The courts are operating at the border of an area considered by draftsmen at great length and framed in legislation arguably relevant to the cases before the courts. Yet, these judges appear either unaware of the merging of the tort and sales lines or else unwilling to consider the possible limitations legislation may impose on traditional judicial primacy in tort law. . . .

"At best, we have judicial lack of awareness of the possible relevance of sales law. At worst, we have open judicial defiance of apparent statutory commands." Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases, 18 Stan.L.R. 974, 989–990 (1966).

The Idaho legislature, and indeed the legislatures of nearly every state in the Union,[6] have adopted the UCC which carefully and painstakingly sets forth the rights between parties in a sales transaction with regard to economic loss. This Court, in the common law evolution of the tort law of this state, must recognize the legislature's action in this area of commercial law and should accommodate when possible the evolution of tort law with the principles laid down in the UCC.

The economic expectations of parties have not traditionally been protected by the law concerning unintentional torts. *Just's, Inc. v. Arrington Constr. Co.*, 99 Idaho ——, —— P.2d —— (1978); Restatement (Second) of Torts, § 766C(c) (Tent. Draft No. 23, 1977); W. Prosser, Handbook of the Law of Torts, § 130 (4th ed. 1971); 1 F. Harper & F. James, The Law of Torts, § 6.11 at 513 (1956). We do not believe that any good purpose would be achieved by undermining the operation of the UCC provisions by extending tort law to embrace purely economic losses in product liability cases. Moreover, the UCC provisions provide the Court with ample room for the exercise of wide judicial discretion to ensure that substantial justice results in particular cases. *See, e. g.*, I.C. §§ 28–2–302 and –2–719(3) (concerning unconscionable clauses and contracts), and I.C. § 28–1–203 (imposing a general obligation of good faith).

The plaintiffs, however, attempt to distinguish this case from those applying the majority rule against the recovery of purely economic losses in tort on the ground that many of the latter cases involved strict liability actions and this case is a negligence action. At least two jurisdictions, and perhaps three, apparently prohibit the recovery of economic losses in strict liability actions but allow their recovery in negligence actions. *Western Seed Production Corp. v. Campbell*, 250 Or. 262, 442 P.2d 215 (1968); *Nobility Homes v. Shivers, supra* ; *Berg v. General Motors Corp.*, 87 Wash.2d 584, 555 P.2d 818·(1976). The Texas court in *Nobility Homes* ruled that economic losses were not recoverable in a strict liability action, but permitted their recovery on the theory of a breach of an implied warranty under the UCC. In its opinion the Texas court noted that the lower courts in that case had also based the recovery on the plaintiff's negligence theory. The defendant had not challenged the negligence finding on appeal to the Texas Supreme Court and that court affirmed the judgment for the plaintiff on the negligence point without discussion.

The Washington court's opinion in *Berg* did not consider the corrosive effect that an extension of negligence law to purely economic losses would have on the efficacy of the provisions of the UCC, a point which we consider of critical importance and an issue which applies to negligence actions as well as to strict liability actions. The Washington court found support for its decision to permit the recovery of purely economic losses in a negligence action in a line of admiralty cases. Although application of those cases to the facts in *Berg* may have been appropriate since the case involved the malfunction of a commercial fishing vessel, admiralty principles are of limited guidance in Idaho.

The Oregon court in *Campbell* recognized that negligence law traditionally has not protected the economic expectations of the parties, stating:

"A buyer's desire to enjoy the benefit of his bargain is not an interest which tort law has traditionally been called upon to protect." 442 P.2d at 218.·

---

6. Louisiana adopted only Articles 1, 3, 4 and 5 of the UCC. 1 Uniform Laws Annotated 5 (Supp.1978).

*Cf. Mandal v. Hoffman Constr. Co.*, 270 Or. 248, 527 P.2d 387 (1974) (denying recovery of economic losses for negligent performance of construction contract). But the Oregon court in *Campbell* went on to extend negligence principles to include the recovery of purely economic losses, stating:

> "Recovery for such negligence, because it is grounded upon fault, falls within traditional tort rules and presents no serious conflict with the statutory system of non-fault recovery under the Uniform Commercial Code." 442 P.2d at 218.

We find the reasoning that there is no conflict with the UCC because negligence actions are grounded in "fault" inadequate. The point is not whether the UCC warranty provisions are a fault or non-fault concept, but whether there is any compelling reason to further extend negligence law into an area in which the legislature has already enacted comprehensive legislation, thereby undermining that legislation. We believe the UCC provisions adequately define the rights of the parties in such cases and that judicial expansion of negligence law to cover purely economic losses would only add more confusion in an area already plagued with overlapping and conflicting theories of recovery.

■ The plaintiffs further argue that, in many of the cases which refused to permit the recovery of damages for economic loss in negligence actions and which are cited by the defendants, the absence of privity of contract between the parties was the determinative factor, not the nature of the damages. There is language in some cases suggesting that the absence of privity may have played a role in the reasoning of some courts which have denied the recovery of purely economic losses in negligence. *See, e. g., Trans-World Airlines, Inc. v. Curtis-Wright Corp.*, 1 Misc.2d 477, 148 N.Y.S.2d 284, 290 (Sup.Ct.1955). The requirement of

privity in negligence actions, an unfortunate amalgam of tort and contract principles, was for the most part laid to rest by Justice Cardozo's famous opinion in *McPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), and we are not disposed to resurrect it in this case. Rather than obscure fundamental tort concepts with contract notions of privity, we believe it is analytically more useful to focus on the precise duty of care that the law of negligence, not the law of contract or an agreement by the parties, has imposed on the defendant International Harvester. The law of negligence requires the defendant to exercise due care to build a tractor that does not harm person or property. If the defendant fails to exercise such due care it is of course liable for the resulting injury to person or property as well as other losses which naturally follow from that injury. However, the law of negligence does not impose on International Harvester a duty to build ·a tractor that plows fast enough and breaks down infrequently enough for Clark to make a profit in his custom farming business. This is not to say that such a duty could not arise by a warranty—express or implied—by agreement of the parties or by representations of the defendant,[7] but the law of negligence imposes no such duty. Accordingly, the trial court erred in granting a judgment to the plaintiffs on their negligence count.

## III

### CROSS APPEAL

The trial court granted summary judgments in favor of both defendants with respect to the plaintiffs' warranty claims. We reverse the partial summary judgments because on several separate legal issues there were material issues of fact. I.R.C.P. 56(c); *Trosper v. Raymond*, 99 Idaho 54, 577 P.2d 33 (1978).

---

7. In their brief plaintiffs attempt to support their argument by analogizing to section 552(d) of a tentative draft of the Restatement (Second) of Torts, which provides a cause of action where a seller has publicly misrepresented the quality of a product, i. e., by advertising, labels, etc. We find the analogy inappro-

priate in this case and, assuming *arguendo* that these plaintiffs may have a cause of action along those lines, that issue was not raised below and no evidence of that nature was presented at trial. Therefore that issue is not properly before this Court.

A. Attached to an affidavit Clark submitted in opposition to the defendants' motions for summary judgment was a copy of the sales form Clark alleged he signed. The "backer" or reverse side of that form refers to but does not set out the defendant International Harvester's regular warranty on new equipment.[8] Clark stated that he was never given a copy of the warranty. However, an affidavit by John Davis, owner of defendant McVey's, stated that the sale was consummated on a form on which the "New Equipment Warranty" was printed on the reverse side. The "New Equipment Warranty" not only states an express warranty but also excludes other express or implied warranties and limits the buyer's remedies. Attached to Davis's affidavit as Exhibit A is a blank copy of the form Davis stated was used.[9] The affidavit states that a copy of the seller's copy of the sales form showing Clark's signature was attached as Exhibit B to the affidavit. The record before this Court does not contain an Exhibit B to that affidavit.

■ In granting the summary judgments the trial court concluded that the form attached as Exhibit A to Davis's affidavit represented the agreement of the parties. However, such conclusion is in direct conflict with the facts stated in Clark's affidavit. At oral argument defense counsel urged that the dispute concerning which form Clark signed was being raised for the first time on appeal and that at the time the order granting summary judgment was entered the parties were in agreement with respect to the form he signed and what was stated in its warranty provisions. The record before this Court indicates no such consensus, but on the contrary, indicates a genuine factual dispute over what warranty provisions were contained in the form Clark signed. Under such circumstances the trial court erred in resolving that factual issue in the summary judgment.[10]

8. The warranty provision Clark claimed was on the form he signed stated:
"WARRANTY
"Each NEW item of equipment covered by this contract is sold under the regular warranty of the manufacturer and no other, and purchaser hereby acknowledges receipt of a copy of such warranty.
"Each USED item of equipment covered by this contract is sold AS IS WITHOUT WARRANTY OF ANY CHARACTER expressed or implied, unless purchaser has received from seller a separate written warranty executed by seller."

9. The warranty provisions on that form state:
"WARRANTY: Each item of NEW International equipment covered by this contract is sold under the regular warranty of International Harvester Company as printed hereon, and no other.

.    .    .    .    .

"NEW EQUIPMENT WARRANTY
"International Harvester Company warrants to the original purchaser each item of new farm and industrial equipment bearing either the identification 'McCormick' or 'International', or a combination thereof, to be free from defects in material and workmanship under normal use and service. The obligation of the Company under this warranty is limited to repairing or replacing as the Company may elect, free of charge and without charge for installation, at the place of business of a dealer of the Company authorized to handle the equipment covered by this warranty, any parts that prove, in the Company's judgment, to be defective in material or workmanship within twelve months or 1500* hours of use, whichever occurs first, after delivery to the original purchaser.

.    .    .    .    .

"THIS WARRANTY AND THE COMPANY'S OBLIGATION THEREUNDER IS IN LIEU OF ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, all other representations to the original purchaser and all other obligations or liabilities, including liability for incidental and consequential damages on the part of the Company or the seller with respect to the sale or use of the items warranted. .    .    .    ."

10. The Court is aware that at the subsequent trial the defendant International Harvester introduced into evidence as defendant's exhibit 1 a copy of the seller's copy of a sales form entitled "Retail Instalment Contract for Farm and Industrial Equipment" numbered FH–1501–H. Clark's signature appears on the form and Davis testified at the trial that it was a copy of the form signed in connection with the sale of the tractor to Clark and that Clark received basically the same document at the time of purchase. That document contains the "New Equipment Warranty" including the warranty disclaimers and appears to be identical to the blank form attached as Exhibit A to Davis' affidavit. Plaintiffs' counsel objected to the introduction of the document on the grounds

B. The plaintiffs also argue in their cross appeal that even if the trial court was correct in concluding that Clark signed a sales form containing International Harvester's "New Equipment Warranty" and that those warranty provisions disclaimed all implied warranties and oral express warranties in accordance with the requirements of I.C. § 28–2–316, there still remained material issues of fact whether (1) the repair or replacement remedy provided in the warranty was the exclusive remedy, and (2) even if it was exclusive, whether the limited remedy had failed of its essential purpose.

In the "New Equipment Warranty" the defendants expressly warranted that the tractor was "free from defects in material and workmanship under normal use and service," but limited their liability to the repair or replacement of parts which proved to be defective within 12 months or 1500 hours of use after delivery. Chapter 2 of the Uniform Commercial Code (UCC) which is applicable to this case, I.C. § 28–2–102, provides that the parties' agreement may limit the buyer's remedies to repair and replacement of nonconforming goods. I.C. § 28–2–719(1)(a). However, subsection (1)(b) creates a presumption that contractual clauses prescribing remedies are cumulative to other available remedies.[11] If the parties intend the stated remedy to be the

sole and exclusive remedy, that intent must be clearly expressed. I.C. § 28–2–719, Official Comment 2.

Most courts have ruled that clauses similar to the "New Equipment Warranty" are adequate expressions of the intent to limit the buyer's remedy to the repair and replacement of defective parts. See e. g., *Cox Motor Car Co. v. Castle*, 402 S.W.2d 429 (Ky.1966); *McCarty v. E. J. Korvette, Inc.*, 28 Md.App. 421, 347 A.2d 253 (1975); *Lankford v. Rogers Ford Sales*, 478 S.W.2d 248 (Tex.Civ.App.1972); J. White & R. Summers, Handbook on the Law Under the Uniform Commercial Code, § 12–9 (1972). However, some courts have construed such provisions very narrowly. For example, in *Ford Motor Co. v. Reid*, 250 Ark. 176, 465 S.W.2d 80 (1971), the court ruled that a clause similar to the clause in this case did not expressly state that the repair and replacement remedy was to be the exclusive remedy since the language in the clause stated that it was in lieu of other obligations and warranties, but did not state that it was in lieu of other remedies.

■ Although this Court is disposed to strictly construe contractual provisions purporting to limit a party's remedies, particularly those provisions printed on the back of sales forms, we are not inclined to torture

that only two pages of a document consisting of four or five different pages was being offered in evidence. The court overruled the objection after Davis testified that all the pages were "basically the same." In finding of fact VI the court found that at the time of sale Clark signed a purchase order form with an attached warranty and warranty disclaimer. Nonetheless we do not believe that this evidence introduced at trial or the finding of fact by the trial court should deprive the plaintiffs of their right to have a trier of fact after the presentation of evidence by both parties resolve the issue of fact concerning the content of the warranty provisions on the back of the form Clark signed. Since the trial was held only on the issue of negligence, the warranty issue having been resolved by the partial summary judgment, the content of the warranty provisions was not an important issue at trial. Furthermore, the court's finding that a warranty and a warranty disclaimer were attached to the form signed by Clark could have been based on its prior determination of that issue in its order

granting summary judgment rather than on an evaluation of the accuracy and credibility of the evidence presented by the defendant at trial.

11. "28–2–719. CONTRACTUAL MODIFICATION OR LIMITATION OF REMEDY.—(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy. . . ."

the plain meaning of the language in such a clause in order to reach an interpretation different from that clearly expressed.[12] The intent of the "New Equipment Warranty," clearly expressed by its terms, is that the purchaser's remedy is to be limited to repair or replacement of defective parts by the defendants.

Even though the sales contract provides for an exclusive remedy, in certain circumstances a party may be nonetheless entitled to the general remedies of the UCC. I.C. § 28–2–719(2) provides:

"28–2–719. CONTRACTUAL MODIFICATION OR LIMITATION OF REMEDY.— . . .

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act."

■ Although this Court has not considered this section in previous cases, other courts have uniformly held that where a party limits its warranty obligation to the repair and replacement of defective parts failure to fulfill that obligation, if such failure operates to deprive the other party of the substantial value of the bargain, causes the limited remedy "to fail of its essential purpose" within the meaning of that section and entitles the party to pursue the remedies otherwise available under the UCC.

In *Ehlers v. Chrysler Motor Corp.*, 226 N.W.2d 157 (S.D.1975), the plaintiff purchased an automobile which was delivered with an undersized crankshaft, a faulty transmission, and improperly installed windows. The defendant refused to repair the automobile. The court ruled:

"By delaying for an unreasonable length of time the repair of respondent's vehicle, appellant deprived him of the 'substantial value of the bargain.' Stated otherwise, the warranty was breached causing the available remedy 'to fail of its essential purpose'. Such failure brings into play all otherwise available remedial devices, to-wit: SDCL 57–8–39 (U.C.C. 2–715(1),

Incidental damages from seller's breach; and 57–8–40 (U.C.C. 2–715(2)), Consequential damages from seller's breach." 226 N.W.2d at 161.

In *Riley v. Ford Motor Co.*, 442 F.2d 670 (5th Cir. 1971), the plaintiff purchased a new automobile and received a "New Vehicle Warranty" in which his remedy was limited to the repair or replacement of defective parts. After the dealer's unsuccessful attempts to repair defects in the automobile the plaintiff sued. The Fifth Circuit Court of Appeals upheld a verdict for the buyer stating that the jury's affirmative answer to the charge to decide "whether the defendant, Ford Motor Co. has breached its warranty and [whether] they were given a reasonable opportunity to repair it and they didn't" was an implicit finding that the remedy provided in Ford's warranty did fail of its essential purpose and operated to deprive the purchaser of the "substantial value of the bargain." 442 F.2d at 673.

In *Adams v. J. I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970), the plaintiff purchased a tractor which was delivered with a defective radiator and hydraulic system. The warranty limited the purchaser's remedy for breach to repair and replacement of defective parts by the seller. The plaintiff alleged that the defendant was "wilfully dilatory" and "careless" in making needed repairs. Reversing a dismissal of the plaintiff's suit, the court stated:

"The manufacturer and the dealer have agreed in their warranty to repair or replace defective parts while also limiting their liability to that extent. Had they reasonably complied with their agreement contained in the warranty they would be in a position to claim the benefits of their stated limited liability and to restrict plaintiff to his stated remedy." 261 N.E.2d at 7.

*Accord, Soo Line R. R. Co. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977); *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435 (S.D.N.Y.1976);

---

12. We will not, however, enforce unconscionable provisions even though expressed with great clarity. *See* I.C. §§ 28–2–302 and 28–2–719(3).

*Koehring Co. v. A. P. I., Inc.*, 369 F.Supp. 882 (E.D.Mich.1974); *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.1973); *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F.Supp. 39 (N.D.Ill.1970); *Kohlenberger, Inc. v. Tyson's Foods, Inc.*, 256 Ark. 584, 510 S.W.2d 555 (1974); *Earl M. Jorgensen Co. v. Mark Constr., Inc.*, 56 Haw. 466, 540 P.2d 978 (1975); *Eckstein v. Cummins*, 41 Ohio App.2d 1, 321 N.E.2d 897 (1974); *Moore v. Howard Pontiac-American, Inc.*, 492 S.W.2d 227 (Tenn.App.1972).

■ In its "New Equipment Warranty" the defendants warranted that the plaintiffs would receive a tractor "free from defects in material and workmanship under normal use and service," but they limited their obligation for breach of that warranty to repairing or replacing defective parts. The "New Equipment Warranty" did not state the time for performance of the repair or replacement obligation. Therefore the defendants were obligated to repair or replace defective parts within a reasonable time pursuant to I.C. § 28–2–309(1).[13]

■ The purpose of the exclusive repair or replacement remedy is to ensure that the purchaser receives a product which conforms to the express warranty, i. e., that the product is free from defects, and if the product proves defective within the warranty period the seller is obligated to cure the defect within a reasonable time. *See Beal v. General Motors Corp., supra;* Eddy, On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2–719(2), 65 Cal.L.Rev. 28, 58–64 (1977). If, however, the seller is subsequently unable or unwilling to repair or replace a defective part within a reasonable time, the buyer is left with a defective product—not conforming to the warranty—and the limited remedy has not achieved its purpose. In such circumstances § 28–2–719(2) permits the buyer to pursue the other remedies provided by the UCC if the defect substantially affects the value of the buyer's bargain.

■ In some cases involving § 2–719(2) of the UCC, the purchasers have alleged dilatory and negligent conduct by the sellers in failing to repair or replace defective goods. *See, e. g., Jones & McKnight Corp. v. Birdsboro Corp., supra; Adams v. J. I. Case Co., supra.* However, proof of negligent or dilatory conduct is not necessary for that provision to apply. I.C. § 28–2–719(2) provides that the party may resort to the general remedies provided by the act "[w]hen circumstances cause an exclusive or limited remedy to fail of its essential purpose." That section does not specifically require the plaintiff to prove negligent or wilfully dilatory conduct. Rather, the section is to apply whenever an exclusive remedy, which may have appeared fair and reasonable at the inception of the contract, as a result of later circumstances operates to deprive a party of a substantial benefit of the bargain. *See* I.C. § 28–2–719, Official Comment 1. Such circumstances may or may not be the result of dilatory or negligent conduct. *See* J. White & R. Summers, *supra,* § 12–10. We agree with the rule summarized by the court in *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.1973):

> "The limited remedy fails of its purpose whenever the seller fails to repair the goods within a reasonable time; good faith attempts to repair might be relevant to the issue of what constitutes a reasonable time. However, since § 2–719(2) operates whenever a party is deprived of his contractual remedy there is no need for a plaintiff to prove that failure to repair was willful or negligent." 354 F.Supp. at 427, n.2.

We note that I.C. § 28–1–203 imposes upon all parties an obligation of good faith in the performance of the contract. Accordingly, the plaintiffs also had a duty to act in good faith to provide the defendants with a reasonable opportunity to repair or replace any defective parts.

---

13. "28–2–309. ABSENCE OF SPECIFIC TIME PROVISIONS—NOTICE OF TERMINATION. —(1) The time for shipment or delivery or any other action under a contract if not provided in this chapter or agreed upon shall be a reasonable time.

.   .   . "

■ In sum, although the defendants may have limited their obligation under the "New Equipment Warranty" to repairing or replacing defective parts, if the tractor was defective and the defendants failed to cure those defects within a reasonable time after being afforded an opportunity to do so, the plaintiffs would be entitled to pursue their general remedies under the UCC pursuant to I.C. § 28–2–719(2).

■ The plaintiffs argue that there were material issues of fact whether the tractor was defective and whether the limited repair or replacement remedy had failed of its essential purpose under I.C. § 28–2–719(2) and that the summary judgments on their warranty claims were therefore improper. This argument raises a threshold question whether this issue was properly raised by the pleadings and presented to the trial court. Issues not presented to the trial court will ordinarily not be considered on appeal. *Dunn v. Baugh*, 95 Idaho 236, 506 P.2d 463 (1973).

■ The plaintiffs' complaint did not specifically allege that the exclusive remedy provided by the "New Equipment Warranty" failed of its essential purpose, but Count Two of the complaint alleged a breach of express and implied warranties and alleged that the defendants had not "cured defects in the manufacturing and the design of the said tractor . . . ." Clark's affidavit submitted in opposition to the motion for summary judgment states:

"I further state that even though I consider [that] Defendant McVey's were very cooperative in attempting to discover the problems I had with the tractor, and this is what I said in my deposition, I do not feel that either Defendant McVey's or Defendant International Harvester Company made any substantial efforts to get to the root of the problem."

In view of the liberal construction in favor of the non-moving party to be given the record on a motion for summary judgment, *Farmers Ins. Co. v. Brown*, 97 Idaho 380, 544 P.2d 1150 (1976), we hold that the issue was raised in the proceedings below and therefore is properly before this Court on

appeal. *Cf. Hutcherson v. Amen*, 98 Idaho 776, 572 P.2d 879 (1977) (affidavit insufficient to raise issue of parental negligence).

The plaintiffs have alleged two distinct defects in the tractor—defective push rods and a defective TA assembly. Either alleged defect could constitute a breach of the "New Equipment Warranty" and each raises slightly different issues with respect to the alleged failure of the limited repair or replacement remedy. We therefore consider them separately and we consider issues concerning the defective push rods first.

1. There is no doubt that at the time the summary judgments were entered there was an issue of fact whether the push rods were defective at the time the tractor was delivered to Clark. Apparently the defendants finally did cure those defects, approximately a year after the problem initially developed and after four successive breakdowns—three of which followed previously unsuccessful attempts by the defendants to repair the tractor. However, we believe there was an issue of fact concerning whether the defendants had failed to cure the defect within a reasonable time, I.C. § 28–2–309(1), thereby causing the limited remedy to fail under I.C. § 28–2–719(2).

Noting these issues of fact, however, is not dispositive of the plaintiffs' argument that the summary judgments were in error. The only damages that the plaintiffs have alleged as a result of the defective push rods are consequential damages, profits lost during the periods of down time while the push rods were being repaired. However, the "New Equipment Warranty" states that it is "IN LIEU OF ALL WARRANTIES, . . . including liability for incidental and consequential damages . . ." If this exclusion of consequential damages is enforceable despite the failure of the repair or replacement remedy to achieve its purpose, the plaintiffs would not have alleged any damages for which the defendants would be liable, even if the push rods were defective and the limited remedy had failed of its essential purpose.

The UCC is ambiguous with respect to the effect that a failure of a limited remedy under § 28–2–719(2) has on other contractual provisions. § 28–2–719(2) provides that if a remedy fails of its essential purpose "remedy may be had as provided in this act." The official comment states that if a remedy fails of its purpose, "it must give way to the general remedy provisions of this article [chapter]." I.C. § 28–2–719, Official Comment 1. The remedy provisions of that chapter not only provide for the recovery of consequential damages, I.C. §§ 28–2–714(3) and –715(2), but also for their exclusion where not unconscionable. I.C. § 28–2–719(3). The majority of the courts in cases involving the failure of an exclusive remedy contained in a warranty provision which also excludes liability for consequential damages have ruled that the provisions limiting liability fail also and that the plaintiffs are entitled to the full array of remedies provided by the UCC, including the recovery of consequential and incidental damages. In *Adams v. J. I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970), the court held:

"The limitations of remedy and of liability are not separable from the obligations of the warranty. Repudiation of the obligations of the warranty destroy its benefits. The complaint alleges facts that would constitute a repudiation by the defendants of their obligations under the warranty, that repudiation consisting of their wilful failure or their careless and negligent compliance. It should be obvious that they cannot at once repudiate their obligation under their warranty and assert its provisions beneficial to them." 261 N.E.2d at 7–8.

In *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F.Supp. 39 (N.D.Ill.1970), the court reasoned:

"Although the plaintiff-buyer purchased and accepted the machinery and equipment with the apparent knowledge that the seller had properly limited its liability to repair or replacement, and although the plaintiff does not allege any form of unconscionability in the transactions which led to the purchase, plaintiff also was entitled to assume that defendants would not be unreasonable ·or wilfully dilatory in making good their warranty in the event of defects in the machinery and equipment. It is the specific breach of the warranty to repair that plaintiff alleges caused the bulk of its damages. This Court would be in an untenable position if it allowed the defendant to shelter itself behind one segment of the warranty when it has allegedly repudiated and ignored its very limited obligations under another segment of the same warranty, which alleged repudiation has caused the very need for relief which the defendant is attempting to avoid. If the plaintiff is capable of sustaining its burden of proof as to the allegations it has made, the defendant will be deemed to have repudiated the warranty agreement so far as restricting plaintiff's remedies, and the exclusive remedy provision of the contract will be deemed under the circumstances to have failed of its essential purpose, thus allowing plaintiff the general array of remedies under the Code." 320 F.Supp. at 43–44.

*Accord, Soo Line R. R. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977); *Koehring Co. v. A. P. I., Inc.*, 369 F.Supp. 882 (E.D.Mich. 1974); *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.1973); *Ehlers v. Chrysler Motor Corp.*, 226 N.W.2d 157 (S.D.1975).

However, in certain commercial contexts some courts have ruled that the failure of an exclusive remedy does not automatically require disregard of other limitations on liability provided by the agreement. *V–M Corp. v. Bernard Distrib. Co.*, 447 F.2d 864 (7th Cir. 1971), is an example of such a case. The *Bernard* case presented a rather unique set of circumstances involving a suit by a manufacturer to collect sums owed by a distributor following termination of their distributorship agreement. The distributor counterclaimed for profits lost because of the manufacturer's alleged failure to deliver goods of adequate and salable quality. In the distributorship agreement the manufacturer warranted that its products were free of defects but limited the distributor's

remedy to the repair or replacement of defective goods by the manufacturer. A separate provision in the agreement provided that neither party would be liable upon termination of the distributorship for loss of prospective profits on anticipated sales. The court ruled that the manufacturer had given the distributor the benefit of the repair or replacement warranty and that the limited remedy therefore had not failed of its essential purpose. In the context of this particular distributorship the court further stated:

"Moreover, we are not persuaded that § 2–719(2) otherwise requires the negation of the specific limitations of the contract. Section 2–719 was intended to encourage and facilitate consensual allocation of risks associated with the sale of goods. This is particularly true where commercial, rather than consumer sales are involved. Even where the defects of the goods cause substantial difficulties to those involved in wholesale and retail distribution, § 2–719(2) need not automatically require disregard of the particular limitations upon liability specified by the contracting parties." 447 F.2d at 869.

In a more recent case, *Am. Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435 (S.D.N.Y.1976), the court distinguished the line of cases following *Jones* and *Adams* and upheld a contractual provision limiting liability for consequential damages despite an alleged failure of an exclusive repair or replacement remedy to achieve its purpose. The court noted that the limitation on liability for consequential damage was a "totally separate provision" from the warranty provisions and noted that the agreement involved the sale of a turbine generator to a utility and was "not of the type entered into by the average consumer, but a commercial agreement painstakingly negotiated between industrial giants" and that "the agreed-upon allocation of commercial risk should not be disturbed . . . where, as here, the warranted item is a highly complex, sophisticated, and in some ways experimental piece of equipment." 418 F.Supp. at 458. An additional distinguishing fact, which the court considered most important, was that pursuant to another provision in the agreement the plaintiff was still entitled to recover the price of the equipment. Consequently, even if the repair or replacement remedy failed entirely, the court concluded that the plaintiff was not left without a minimum adequate recovery.

We find none of the distinguishing characteristics of *American Electric Power* present in the case before us. This case does not involve a highly complex or experimental piece of equipment, but a standardized tractor which the plaintiffs were fully entitled to expect would be delivered to them free of defects which could not be cured within a reasonable time. There was a significant disparity in bargaining power between the parties in this case. The terms of the contract were not the result of painstaking negotiations, but were contained in a printed form.

The "New Equipment Warranty" on that form provided that the warranty and the repair or replacement remedy were "in lieu" of all other express and implied warranties and of liability for consequential damages. These various elements of the "New Equipment Warranty"—the express warranty, the limited repair or replacement remedy, the disclaimer of other warranties, and the exclusion of liability for consequential damages—are all integral parts of the provision, reciprocal to one another, and together they represent the agreed allocation of risk between the parties. Under these circumstances a seller who fails to comply with its obligations under the warranty, such as its repair or replacement duties, cannot receive the benefit of the other provisions, which in part at least were premised on the assumption that the seller would fulfill its obligations. The failure of the limited remedy in this case would materially alter the balance of risk set by the parties in the agreement. In such situation we conclude that the other limitations and exclusions on the seller's warranties and liability must also be disregarded and that

the general provisions of the UCC should govern the rights of the parties.[14]

■ In sum, we conclude that the reasoning of the *Adams* and *Jones* line of cases is appropriate to the facts of this case. If the plaintiffs are able to prove that there was a defect in the push rod assembly and that the limited remedy provided by the "New Equipment Warranty" failed of its essential purpose, then they are entitled to the full array of remedies provided by the UCC, including recovery of consequential and incidental losses under I.C. § 28–2–714(3). Since we have concluded that there were material issues of fact whether the remedy provided by the sales contract had failed of its essential purpose, the summary judgment was improper with respect to this issue.

2. We consider now issues concerning the alleged defect in the TA assembly. At the outset we note that if the plaintiffs are able to establish that the repair or replacement remedy failed of its essential purpose with respect to the push rod problem then, as we discussed above, not only the exclusions on consequential damages but also the disclaimers of other warranties would become nullities. Accordingly, in such case the plaintiffs would be entitled to sue with respect to the alleged defect in the TA assembly for a breach of implied warranties or any other express warranties. *See* I.C. §§ 28–2–313, –314 and –315.

3. However, if the plaintiffs are not able to establish that with regard to the push rods the "New Equipment Warranty" failed of its essential purpose, there still remain other issues of fact which must be resolved. By the terms of the "New Equipment Warranty" the defendants were obligated to repair or replace parts which proved to be defective within 12 months of the date of delivery or 1500 hours of use, whichever

occurred first. Absent a modification, waiver, *see* I.C. §§ 28–2–208(3) and –209, or elements of estoppel, the defendants were under no contractual obligation to repair or replace parts which proved to be defective subsequent to the warranty period. In this case the tractor was delivered to Clark on January 22, 1972, but he did not experience the loss of power in the TA mode, which he later attributed to a defect in the TA assembly, until the fall of 1973, well after one year from the date of delivery. However, in light of Clark's statement in his deposition that the warranty was extended, and since the defendant did replace the push rods under the warranty in the spring of 1973, there was a genuine issue of fact whether the 12 month limitation had been extended or waived by the defendants.

4. The plaintiffs also argue that there was an issue of fact whether the defect was a latent defect not reasonably discoverable within one year. In such case the plaintiffs argue that the limited remedy would fail of its essential purpose. To support this argument plaintiffs rely on *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968). In that case a sales contract for yarn provided that the seller would not be liable for any claims relating to the quality or shade of the yarn made after processing or made more than ten days after receipt by the buyer. The buyer alleged a defect in the color of the yarn and that the defect was not discoverable until after the yarn had been processed and washed. The court ruled that since the buyer had alleged that the defect could not be discovered before processing the "time provision eliminates all remedy for defects not discoverable before knitting and processing and § 2–719(2) of the Uniform Commercial Code therefore applies." 297 N.Y.S.2d at 113, 244 N.E.2d

---

14. We note that in this case if the plaintiffs are able to prove a defect which caused the damage to the push rods and prove that the limited remedy failed of its essential purpose, the trial court could disregard not only the exclusion of consequential damages but also the disclaimer of implied and other express warranties. Although this is of no consequence with respect

to the push rod problem since the plaintiffs must prove a breach of the express warranty in the sales contract in order to prove that the repair or replacement remedy failed of its purpose, it may be of some significance with respect to the alleged defects in the TA assembly, which developed subsequent to the push rod problems.

at 688. A concurring opinion concluded that the proper issue was whether the time limitation was "manifestly unreasonable" under § 1–204 of the UCC and that it was not necessary to consider the other sections of the code.

Commentators have criticized *Wilson Trading* for applying the provisions dealing with the failure of the purpose of a limited remedy rather than provisions dealing with inherently oppressive terms. Referring to that case Professors White and Summers stated:

"It was not circumstances that left the buyer remediless but rather his own agreement to assume the risk for defects that could not be discovered within ten days. The stipulated remedy may have been unreasonable or unconscionable (and unenforceable for that reason), but it did not fail to achieve its essential purpose—to indemnify the buyer against latent defects that could have been discovered within ten days." J. White & R. Summers, Handbook on the Law Under the Uniform Commercial Code, § 12–10 at 381 (1972).

We agree with the commentators and the concurring opinion in *Wilson Trading*. Therefore, the proper issues raised by the plaintiffs' argument as to the alleged defect in the TA assembly are whether the one year limitation is invalid as "manifestly unreasonable" under I.C. § 28–1–204(1) or as unconscionable under I.C. § 28–2–302. A determination of these issues requires a careful consideration of the purpose and effect of the time limitation, the commercial setting in which the contract was executed and the reasonableness at the time of contracting of the time limitation. I.C. § 28–2–302 and Official Comments 1 and 3; I.C. § 28–1–204(1) Official Comment 1. Such determinations require the resolution of factual issues which the trial court must make in the first instance. On remand both parties are entitled to present evidence relevant to these considerations. I.C. § 28–2–302(2).

By way of summary, we have concluded that (1) there were material issues of fact whether the tractor's push rod assembly was defective and therefore in breach of the "New Equipment Warranty" which warranted the tractor to be free of defects, and whether the exclusive repair or replacement remedy had failed of its essential purpose so as to permit the plaintiffs to recover the lost profits they sustained as a result of that defective condition. Resolution of this issue in favor of the plaintiffs would also have the effect of precluding the defendants from later asserting the disclaimers of implied and other express warranties contained in the "New Equipment Warranty." (2) There was an issue of fact whether the "New Equipment Warranty" had been extended or waived or was unenforceable. If these issues are resolved in favor of the plaintiffs, there will also be issues of fact whether the TA assembly was defective and therefore in breach of the express "New Equipment Warranty" and whether the limited repair or replacement remedy had failed of its essential purpose.[15]

## IV

## DAMAGES

The defendant challenges the damages the trial court awarded the plaintiffs on the grounds that (1) the damages awarded for lost profits were speculative and conjectural, (2) the plaintiffs failed to mitigate their losses, and (3) the trial court erred in permitting the recovery of Dr. Limpert's fee for repairing the tractor. In view of our reversal of the plaintiffs' negligence theory of recovery upon which the award of these damages was based, the award of damages necessarily must also be reversed. However, because of our reversal of the summary judgments against the plaintiffs on their

---

**15.** Although we do not decide them here, this case also suggests issues whether clauses excluding a seller's liability for consequential damages would be unconscionable and therefore unenforceable under I.C. § 28–2–719(3) in certain circumstances where the seller has limited the buyer's remedy to the repair or replacement of defective parts and that remedy has failed of its essential purpose.

warranty claims, virtually identical issues may arise again on remand. We therefore believe that the interests of justice and judicial economy are best served by our consideration of these issues at this time, but in the context of damages for breach of warranty. *See* I.C. § 1–205. Hence, assuming *arguendo* that on remand the plaintiffs are able to establish that the defendants are liable for damages under the UCC, the issue we now consider is whether the plaintiffs satisfactorily proved their damages in the prior trial for purposes of recovery under the UCC so as to avoid the necessity of retrying those issues on remand.

The UCC permits a buyer to recover consequential damages resulting from the seller's breach of warranty. I.C. § 28–2–714(3). The consequential damages which the buyer may recover include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . ." I.C. § 28–2–715(2)(a). The consequential damages which are recoverable under this section have been held to include lost profits resulting from lost use of a defective product. *Adams v. J. I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (1970); *Bob Anderson Pontiac, Inc. v. Davidson*, 155 Ind.App. 395, 293 N.E.2d 232 (1973); *Ford Motor Co. v. Taylor*, 60 Tenn.App. 271, 446 S.W.2d 521 (1969). *See* 2 R. Anderson, Uniform Commercial Code, § 2–715.26 (2d ed. 1971). The damages sought by the plaintiffs in this case fall within the scope of damages recoverable pursuant to those sections.

■ However, there are certain limitations on the right to recover consequential damages under § 28–2–715(2)(a). First, the losses must have resulted from needs which the seller knew or had reason to know at the time of contracting. I.C. § 28–2–715(2)(a) and Official Comment 2; J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code, § 10–4 (1972). The trial court found that at the time Clark purchased the tractor he also purchased a plow and a disc and that the

defendant McVey's informed Clark at the time of sale that the tractor had sufficient horsepower to pull the plow, the disc, and also a 24-foot preplant applicator. The court further found that defendant McVey's knew that the tractor and the equipment were purchased for use in Clark's custom farming business. These findings are supported by the evidence introduced at trial. We conclude therefore that the plaintiffs adequately established that the defendant McVey had reason to know at the time of contracting that if the tractor were defective the plaintiffs would suffer the consequential losses for which they now seek recovery.

■ Second, the damages recoverable under § 28–2–715(2)(a), like other damages recoverable for breach of contract, must be established with reasonable certainty. *See* I.C. § 28–2–715, Official Comment 4; J. White and R. Summers, *supra*, at 321–323 (1972); 2 R. Anderson, *supra*, § 2–715.9. The requirement of certainty applicable to damages for lost profits under § 28–2–715 is essentially the same standard of certainty this Court has applied in cases involving the recovery of lost profits in other contexts. *See, e. g., Rindlisbaker v. Wilson*, 95 Idaho 752, 519 P.2d 421 (1974) (personal injury); *Jolley v. Puregro Co.*, 94 Idaho 702, 496 P.2d 939 (1972) (conversion of farm machinery). *See also Nora v. Safeco Ins. Co.*, 99 Idaho 60, 577 P.2d 347 (1978).

■ . The defendant argues that the damages for lost profits sought by the plaintiffs are speculative and conjectural since the plaintiffs' custom farming business was a new business without an established earning record to form a basis of an accurate estimation of lost profits. Although prospective profits hoped to be derived from a business which is not yet established but merely in contemplation are ordinarily too speculative to be recoverable, *Rindlisbaker v. Wilson, supra* ; *C. R. Crowley, Inc. v. Soelberg*, 81 Idaho 480, 346 P.2d 1063 (1959), a plaintiff is not categorically denied the right to recover lost profits simply because he is engaged in a relatively new business. The pivotal question is not

whether the plaintiff has proven an established earning record but whether he has proven the damages for lost profits with reasonable certainty, although the former is often relevant to the latter.

In this case Clark operated the tractor in preplanting and plowing operations in the spring and fall of 1972 and in the spring of 1973, except for a few days while the tractor's engine was being repaired. He also operated the tractor on a limited basis during the spring of 1974. Both Clark and a representative of United States Steel, a firm with which Clark had a contract for custom farming, testified that there was sufficient work to keep the tractor in operation during the periods of down time.

The plaintiffs computed their damages for lost profits through the use of a formula which included as factors (1) the number of acres the tractor, if functioning properly, could cover in an hour in plowing and preplanting operations based on Clark's experience; (2) the payment rate per acre for plowing and preplanting during the various periods of down time; (3) operation and maintenance costs; and (4) the number of hours of down time because of the alleged tractor malfunctions. Using this formula the plaintiffs computed their damages for lost profits to be $24,246.00. The plaintiffs also computed their damages using an alternative formula which substituted for the number of acres that could be plowed and preplanted in an hour based on Clark's experience a figure derived from a ground speed chart published by the defendant International Harvester. Computed according to this alternative method, the plaintiffs' damages for lost time totaled $25,963.70. According to the plaintiffs' brief, this alternative calculation was introduced to demonstrate the reliability of Clark's estimations. The trial court awarded the lesser figure which was based on Clark's own experience.

▇ We conclude that the plaintiffs set forth sufficient facts to enable them to reasonably estimate their lost profits for down time and proved those damages for lost profits with reasonable certainty.

▇ The defendant also argues that the trial court erred in failing to hold that the plaintiffs did not properly mitigate their damages. The UCC permits recovery only of those consequential damages "which could not reasonably be prevented by cover or otherwise." I.C. § 28–2–715(2)(a). However, the plaintiffs were only required to take reasonable efforts to mitigate their damages, *R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749 (10th Cir. 1975), and the burden of proving that the damages could have been minimized was on the defendants. *Kohlenberger, Inc. v. Tyson's Foods, Inc.*, 256 Ark. 584, 510 S.W.2d 555 (1974); *LTV Aerospace Corp. v. Bateman*, 492 S.W.2d 703 (Tex.Civ.App.1973). *See* D. Dobbs, Handbook on the Law of Remedies, § 3.7 at 189 (1973).

Clark testified that he had investigated the possibility of renting a substitute tractor but had determined that it was economically impractical. However, he did on one occasion use a tractor supplied by defendant McVey's for several days while McVey's was repairing his tractor. Although some testimony suggested that the plowing and preplanting problems could have been ameliorated by alterations in the implements, it was not established that the particular implements used by Clark could be so altered. The defendant presented no evidence that the plaintiffs could have mitigated their damages by renting a substitute tractor. The record does not indicate that the plaintiffs acted other than in a commercially reasonable manner. Therefore, we affirm the trial court's conclusion that "[n]either defendant has proved that plaintiffs failed to mitigate damages."

▇ The defendant also assigns as error the award of $2,112 to the plaintiffs for the repair of the TA assembly. The trial court found that the sum represented the fee charged by Dr. Limpert to diagnose and repair the defect in the TA assembly. The determinative issue is a factual question whether the $2,112 was paid as consideration for expert testimony or preparation of evidence for litigation, or whether the

**348**

sum was paid as consideration for repairing the tractor. The trial court's finding is supported by substantial evidence and will not be disturbed by this Court on appeal. I.R.C.P. 52(a). The cost of repair has been held to be a proper measure of the difference in value between the goods as warranted and as accepted and therefore is recoverable under I.C. § 28–2–714(2) in breach of warranty cases. *Wagner Tractor, Inc. v. Shields*, 381 F.2d 441 (9th Cir. 1967); *Curtis v. Murphy Elevator Co.*, 407 F.Supp. 940 (E.D.Tenn.1976); J. White and R. Summers, *supra*, § 10–2 at 308.

### V

In summation, we have ruled that the plaintiffs were not entitled to recover purely economic losses under their negligence theory. We therefore reverse the judgment in favor of the plaintiffs entered by the district court following the trial.

We have concluded that because there were material issues of fact the trial court erred in granting the partial summary judgments in favor of the defendants on the plaintiffs' warranty theory. We therefore reverse those partial summary judgments and remand the case for trial of the plaintiffs' warranty claims in accordance with this opinion.

We have concluded that the plaintiffs satisfactorily proved their damages in the prior trial. Accordingly, on remand the parties need not retry the damage issues; the plaintiffs are entitled to recover the damages, or any portion thereof, determined in the prior trial for which they are able to establish the defendants' liability under their warranty theory.

Reversed and remanded.

SHEPARD, C. J., and McFADDEN, DONALDSON and BISTLINE, JJ., concur.