515 P.2d 41

Raymond L. BEAUCHAMP and Nina Jean Beauchamp, his wife, Appellants,

v.

Clarence J. WILSON and Florence Wilson, his wife; Clarence Wilson and Florence Wilson, his wife, doing business as Wilson Motors; R. Gary Gibson and Marguerite Gibson, his wife; International Harvester Company, a corporation; General Insurance Company of America, a Washington corporation; United States Fidelity and Guaranty Company, a Maryland corporation, Appellees.

No. 2 CA–CIV 1286.

Court of Appeals of Arizona, Division 2.

Oct. 25, 1973.

Rehearing Denied Nov. 20, 1973.

Review Denied Dec. 18, 1973.

Donald C. Cox, Eloy, for appellants.

Stanfield, McCarville, Coxon & Ishmael, by Thomas A. McCarville, Casa Grande, for appellees Clarence J. Wilson, and Florence Wilson dba Wilson Motors, R. Gary Gibson, and United States Fidelity & Guaranty Co.

Jennings, Strouss & Salmon, by John S. Hobbs, Phoenix, for appellees International Harvester Co. and General Ins. Co. of America.

### OPINION

HATHAWAY, Chief Judge.

Appellants, Plaintiffs below, were the purchasers of a "tractor" (a diesel truck that pulled semi-trailers). They sued International Harvester, manufacturer of the tractor, the Wilsons, owners of Wilson Motors, the company which sold the tractor to them, the Gibsons, (Mr. Gibson was sales manager of Wilson Motors) and their respective bonding companies. The case was tried to a jury which returned a verdict in favor of all defendants and after denial of their motion for a new trial, the plaintiffs appeal.

The pertinent allegations of the plaintiffs' complaint were that: On December 22, 1967, they purchased the subject tractor upon the express representation that it was "the latest thing out"; they took delivery of the tractor on or about January 10, 1968; the plaintiff-husband did not operate the tractor until on or about April 4, 1968, and after he commenced operating it, discovered it had defects and was not the latest thing out; the tractor was to be well-suited for the purposes for which it was to be used; plaintiff-husband advised the defendants of the defects and "on each occasion was told to keep operating the tractor and then bring it back to see if work previously done was adequate"; there were many breakdowns and lost time, resulting in damage to the plaintiffs as a result of the breach of express and implied warranties; the plaintiffs relied on the defendants' continuing representation that the tractor was "the latest thing out" and that it could be repaired and made operable, which was not done; and the plaintiffs had rescinded the contract of sale and demanded the return of all monies paid by them.

The prayer for relief requested that the contract of sale be rescinded, that the defendants return all money paid by the plaintiffs, and that plaintiffs have damages

in a reasonable sum for the breach of warranty. It is interesting to note that the caption of the complaint reads "Fraud, Deceit, Misrepresentation and Breach of Warranty". The plaintiffs' complaint, however, despite any liberality in which we may indulge as to construction of pleadings, falls far short of satisfying the requisite averments for pleading fraud.

Although this lawsuit was instituted in December, 1968, the case was not tried until April, 1972. At the conclusion of the pretrial conference, the court made an order with reference to exchange of exhibits, prospective witnesses and updating interrogatories; further, pursuant to stipulation of counsel, no further pretrial order would be required. Thus we see that the record contained no pretrial order in accordance with Rule 6(c), Uniform Rules of Practice, 17A A.R.S. We therefore presume that the issues of fact to be litigated at the trial were those formed by the pleadings. Four days prior to trial, plaintiffs filed a document captioned "Notice of Intent to Claim Punitive Damages", requesting leave of court to claim punitive damages at trial.

At the conclusion of the trial, the court did instruct the jury as to fraud, breach of warranty, innocent misrepresentation, and rescission. However, it declined to instruct the jury on strict liability in tort, punitive damages, and violation of the Consumer Fraud statutes.

The following evidence was presented at trial. In November, 1967, Mr. Beauchamp approached Mr. Gibson, sales manager for Wilson Motors, concerning the purchase of a truck and requested brochures on the various models. He later returned and informed Mr. Gibson as to the type of truck he was seeking and the type of goods he intended to haul, namely, aluminum products, and that he would be hauling from Casa Grande to San Diego. Wilson Motors was not an authorized dealer of large diesel trucks, and Mr. Gibson had never sold one prior to the time in question. Beauchamp knew that Wilson Motors did not handle this type of truck in their normal business, but instructed Gibson as to what he wanted in hopes that something could be found.

In the latter part of December, 1967, Gibson located a truck at Hamilton Motors in Tucson and both he and Beauchamp went to Tucson to inspect the truck. Beauchamp inspected the truck and according to Gibson (which was denied by Beauchamp) the line setting ticket which contained a list of all the major parts of the truck and the date of manufacture was with the truck and they both went over the list to see what equipment was on the truck.

On December 22, 1967, the contract of sale was executed—the purchase price was $26,779.92, of which $18,677.00 was to be financed. At that time, Beauchamp's father, who was present, inquired if there was a newer model than this about to come out. According to Beauchamp, Gibson responded not so far as he knew, and that the truck "was the latest thing coming out". According to Gibson, however, he never used the expression, "the latest thing out" but simply responded that it was a new truck. The contract for sale designates the truck as being a new 1968 model. The truck was actually manufactured in 1966, but since trucks do not come out in regular model years as do automobiles, the policy of International Harvester and the trucking industry was to use the year the model was sold as the "model year". This policy was registered with the Motor Vehicle Department of every state and the federal government.

In January, 1968, Mr. Beauchamp received his line setting ticket, together with his warranty. The ticket reflected that the date of manufacture was 1966, but Beauchamp admitted that he did not read it. He made no extensive use of the truck until April, 1968, at which time he had driven it about 3,046 miles. In April, he commenced long-distance hauling under a contract with a transport company and while on a trip during that month, had to have the vehicle repaired in Nebraska. The re-

pair work was done under warranty and at that time he learned of the 1966 date of manufacture. From April 4, 1968 until October 13, 1968, during which Mr. Beauchamp drove approximately 77,000 miles, numerous problems arose with the truck, most of which were repaired under the International Harvester warranty, although Beauchamp expended about $800.

In October, the engine froze and Beauchamp took it to International Harvester in Phoenix for repairs. The cost of repairs was $1,200 which was not covered by warranty, but International Harvester agreed to waive the repair charge if Beauchamp paid two delinquent payments of $612.19 each. Beauchamp did not have the money for the payments and he felt that he should be able to take the truck to see if they had fixed it, and catch up on the payments later. This was 'not acceptable to International Harvester, so Beauchamp "decided the truck wasn't any good" and demanded the return of his money. There was some discussion concerning a new truck with a trade-in on the old one and Beauchamp finally told International Harvester that "they could keep" the truck.

Mr. Beauchamp admitted that he relied on his own judgment as well as Gibson in deciding whether or not he wanted to buy the truck and that he signed the sales agreement, which included the warranty, without reading any of it except the part relating to his payments and the interest.

Appellants enumerate various grounds for reversal which appellees have characterized as a "shotgun approach". Appellants' response to this characterization is that a shotgun is the proper weapon when there is a "covey of errors". We are of the opinion, after reviewing the record, that appellants' weapon is loaded with blanks.

■ We find no error, as contended by appellants, in the court's refusal to instruct on strict liability in tort. Mr. Beauchamp purchased a truck which he claimed did not function properly and therefore he sought to recover his commercial losses, namely lost profits and a refund of the money he paid. The "defects" did not cause physical harm to persons or property. Under these circumstances, the doctrine of strict liability in tort is not applicable. Seely v. White Motor Co., 63 Cal. 2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965); Rhodes Pharmacal Company v. Continental Can Company, 72 Ill.App.2d 362, 219 N.E. 2d 726 (1966); Price v. Gatlin, 241 Or. 315, 405 P.2d 502 (1965); Ford Motor Company v. Lonon, 217 Tenn. 400, 398 S. W.2d 240 (1966); Southwest Forest Industries, Inc. v. Westinghouse Electric Corp., 422 F.2d 1013 (9th Cir. 1970), cert. den. 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138.

As stated by the California Supreme Court in *Seely,* supra:

"The law of sales has been carefully articulated to govern the economic relations between suppliers and consumers of goods. The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or of the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries." 45 Cal.Rptr. at 21, 403 P.2d at 149.

And:

"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.

A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will." 45 Cal.Rptr. at 23, 403 P.2d at 151.

Appellants attempted to impose liability upon the theory that the truck purchased by them was represented to be a 1968 model, "the latest thing out", when in fact it was manufactured in 1966. The jury apparently concluded, in view of International Harvester's policy as to the model year, that calling the truck a "1968 model" was not false. Absent proof of a "misrepresentation", appellants' claim fails.

Appellants also sought to recover on breach of warranty, express and implied. As to the implied warranties of fitness and merchantability, the contract[1] between Wilson Motors and appellants (which Mr. Beauchamp admittedly did not read) contains the following:

"NEW INTERNATIONAL MOTOR VEHICLE WARRANTY

The International Harvester Company warrants each new International motor vehicle to be free from defects in material and workmanship under normal use and service, its obligation under this warranty being limited to repairing or replacing, as the Company may elect, any part or parts thereof, including all equipment or trade accessories (except tires and tubes) supplied by the International Harvester Company, which shall be returned to the seller's place of business (or in the event of an emergency, to an International Harvester Dealer authorized to handle motor vehicles of the model covered by this warranty), . . .

This warranty is in lieu of all other warranties, expressed or implied, including, without limitation, warranties of MERCHANTABILITY and FITNESS FOR PARTICULAR PURPOSE, all other representations to the original purchaser, and all other obligations or liabilities, including liability for incidental and consequential damages, on the part of the Company or the seller. No person is authorized to give any other warranties or to assume any other liability on the Company's behalf unless made or assumed in writing by the Company, and no person is authorized to give any warranties or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller."

The warranty mailed to appellants by International Harvester contained like provisions.

The Supreme Court of Arizona has held that contracting parties may by express agreement negative any of the warranties of the Uniform Sales Act. O. S. Stapley Company v. F. O. Newby, 57 Ariz. 24, 110 P.2d 547 (1941). It is plain from the above-quoted warranty, that Wilson Motors expressly limited its warranties to those of the manufacturer and the sole warranty of the manufacturer was with respect to defects in material and workmanship. Therefore, any claim for breach of warranty by appellants is circumscribed by the provisions of the parties' agreement. Min-A-Con Equipment Company v. T. M. K. Construction Company, 102 Ariz. 24, 424 P.2d 152 (1967).

Appellants contend that the trial court erroneously required them to elect whether to rescind the contract or to maintain an action in damages. They elected rescission and now complain of being forced into such an election. We find no error since, whether appellants' claim was founded on fraud or breach of warranty, they were required to make such election. Billman v. Ace Restaurant Supply Company, 5 Ariz.App. 56, 423 P.2d 132 (1967);

---

1. This contract was not governed by the provisions of the Uniform Commercial Code, A.R.S. § 44-2201 et seq., which became effective on January 1, 1968.

Jennings v. Lee, 105 Ariz. 167, 461 P.2d 161 (1969).

◼ As noted above, Mr. Beauchamp certainly knew in April 1968 that the truck had been manufactured in 1966. Assuming arguendo that such fact would constitute a basis for rescission, the jury may well have concluded that appellants had waived their right to rescind. A purchaser may waive or lose the right to rescind a contract for fraud, breach of warranty, or failure of the article purchased to conform to the contract if he uses it as his own property, for his own benefit or convenience, after he has knowledge of the grounds for rescission. Colvin v. Superior Equip. Co., 96 Ariz. 113, 392 P.2d 778 (1964); Elwood Edwards Auto Sales, Inc. v. Kinsey, 123 Colo. 52, 225 P.2d 59 (1950). Mr. Beauchamp used the truck for his own benefit for a protracted period of time notwithstanding numerous defects which required repair. He made no attempt to rescind the contract and return the truck until after he had used it for 77,000 miles. It can hardly be said that such use was for the purpose of testing the truck. The question of whether a right to rescission has been waived is one of fact for the jury. Mayer v. Northwood Textile Mills, Inc., 105 Cal. App.2d 406, 233 P.2d 657 (1951). The evidence here was sufficient to support a finding of waiver.

◼ In summary, we reject any claim that the evidence was insufficient to sustain the jury's verdict. The jury may well have concluded either that there was no basis for rescission or that, if appellants had a right to rescind, they had waived such right.

◼ We find no merit in the remaining contentions of error. As to the refusal to instruct on punitive damages, we find ourselves in agreement with the trial court that the evidence was insufficient to warrant the giving of such instruction. It reflects no "reckless indifference to the interest of others" or conduct "in violation of societal interest to such an extent as to warrant punishment". See King v.

O'Rielly Motor Co., 16 Ariz.App. 518, 494 P.2d 718 (1972). As to the admissibility of an exhibit setting forth International Harvester's policy of not having a yearly model change, appellants have demonstrated no prejudice and the record reflects unobjected-to oral testimony concerning this policy.

◼ A requested instruction concerning the Consumer Fraud statutes, A.R.S. § 44–1521 et seq. was improper since they had no application to the facts of the case. We likewise find no error in the court's order quashing a subpoena duces tecum served upon a witness March 29, 1972, just a few days prior to trial. If a subpoena is unreasonable and oppressive, the court has discretion to quash it. Rule 45(b), A.R.C.P., 16 A.R.S. Production of documents physically located in Chicago and requiring a great deal of time to assemble on such short notice could properly be deemed unreasonable. Finally, appellants' oblique reference to wrongful repossession and sale is not appropriate since it was not in issue.

Judgment affirmed.

KRUCKER and HOWARD, JJ., concur.