626 F.2d 280
 29 UCC Rep.Serv. 1184
 JONES & LAUGHLIN STEEL CORPORATION, a corporation, Appellant
v.
JOHNS-MANVILLE SALES CORPORATION, a corporation, (Defendant
and Third-PartyPlaintiff), Appellant
v.
BROWN & KERR, INC., J. M. Foster Company, Inc., Western
Contracting Corporationand S. M. Wilson Company
d/b/a Hennepin Contractors
v.
PULLMAN, INC. (Third-Party Defendant).
 Nos. 79-1433, 79-1434.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 12, 1980.
Decided July 9, 1980.
 
 David B. Fawcett, Jr. (argued), Richard S. Dorfzaun, Christine W. Caprio, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for Jones & Laughlin Steel Corp.
 Frederick J. Francis (argued), Alexander Unkovic, Ronald D. Morelli, Meyer, Unkovic & Scott, Pittsburgh, Pa., for Johns-Manville Sales Corp.
 Before ADAMS, van DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 This diversity case presents an interesting question regarding the interface between tort law and contract law. Specifically, we are asked to decide inter alia whether, under Illinois law, a purchaser of a product pursuant to a contract may recover damages under tort theories of liability for the failure of the property to perform satisfactorily. The district court, in declining to grant the defendant's motion for judgment notwithstanding the verdict, answered this question in the affirmative. As to this point, we reverse; in all other respects, we affirm the judgment of the district court.
 
 I. FACTS
 
 2
 In the early 1960s, the plaintiff, Jones & Laughlin Steel Corporation, developed plans to build a steel finishing plant on a 6,000 acre tract of land in Hennepin, Illinois. The roof of the building was of particular concern to Jones & Laughlin inasmuch as the size of the roof 1.3 million square feet was extraordinarily large, and the weather in the Hennepin area is harsh winds of high velocities are common and the temperature fluctuation is extreme. Both factors were expected to subject the roof to vigorous, and potentially destructive, wear-and-tear. In addition, it was anticipated that the plant would contain electrical equipment and finished steel products, valued at millions of dollars, that had to be protected from the elements. As a result of these concerns, Jones & Laughlin decided to retain Johns-Manville Sales Corporation, a well-known manufacturer and installer of roofing products, to recommend and supply suitable roofing materials. After being briefed on the design of the roof and informed of the weather conditions in the area surrounding Hennepin, a senior sales representative of Johns-Manville recommended a smooth-surfaced roof with a built-up asbestos felt membrane. The type of roof was chosen for its durability and ease of repair. The sales representative also suggested Fesco Board insulation because it could withstand the uplift caused by extremely high winds, was virtually waterproof, and had outstanding dimensional stability.
 
 
 3
 Jones & Laughlin reviewed Johns-Manville's recommendations and, on March 7, 1966, decided to include the Johns-Manville roofing system in the architectural plans for the plant. Construction of the roof began on November 14, 1966, and was completed on August 30, 1967. During this period, Johns-Manville supervised the installation work, which was performed by several roofing contractors.
 
 
 4
 Shortly after the roof was completed, several problems developed. The roof began to blister, wrinkle, and crack. The cracks permitted water to enter the steel mill, which in turn damaged some of the steel products under construction and caused electrical outages as well. Then, in December 1968, portions of the asbestos felt and Fesco Board began to tear away from the deck of the roof. Although the maximum wind speed recorded in the Hennepin area at the time in question was only eighty miles per hour, and the roof was designed to withstand winds in excess of one hundred-twenty miles per hour, fourteen portions of the roof, totaling 93,800 square feet, were blown off between January 1969 and December 1971. The remaining area of the roof continued to blister and crack.
 
 
 5
 Jones & Laughlin employed Edward T. Schreiber, a roofing consultant, to analyze the causes of the defects that developed in the roof. Schreiber subsequently testified at trial on behalf of Jones & Laughlin. He concluded that Fesco Board was not water resistant, but instead actually absorbed water and became spongy. According to Schreiber, Fesco Board also lacked internal strength and the absorption of moisture caused severe dimensional distortion in the board. He stated further that the glue recommended by Johns-Manville was sensitive to water vapor, which caused the glue to deteriorate and fail. This resulted, Schreiber asserted, in the cracking and tearing away of the roof. Schreiber recommended that the entire roof be removed and replaced. Jones & Laughlin declined to proceed with such a large undertaking, however, and instead repaired and replaced portions of the roof.
 
 
 6
 On August 7, 1972, Jones & Laughlin filed suit against Johns-Manville in the Court of Common Pleas of Allegheny County, Pennsylvania. The complaint was premised on a number of legal theories: (1) strict tort liability for defects in the roofing products; (2) strict tort liability for the faulty design of the roofing system; (3) strict tort liability for public misrepresentations regarding the roofing products; (4) fraudulent misrepresentation; (5) negligent misrepresentation; (6) negligent performance of an undertaking to render services; (7) breach of express and implied warranties; and (8) breach of contract. On September 14, 1972, Johns-Manville removed the case to the United States District Court for the Western District of Pennsylvania.[1]
 
 
 7
 Accompanying its answer, Johns-Manville named as third-party defendants the general contractor, the roofing subcontractor responsible for installation of the roof, and the engineering firm that Jones & Laughlin retained as the architect for the plant. A number of cross-claims were filed among the original parties and the third-party defendants. Inasmuch as the claims involving the third-party defendants are not pertinent to the issues before us, and because the third-party defendants are not parties to these appeals, the cross-claims will not be discussed further.
 
 
 8
 On June 30, 1976, Johns-Manville moved for summary judgment. The district court concluded that the case was governed by Illinois law and granted partial summary judgment in favor of Johns-Manville on the claims asserted by Jones & Laughlin based on express and implied warranties.[2] The court held that the contract between Jones & Laughlin and Johns-Manville was not for a "sale of goods" within the meaning of § 2-106 of the Uniform Commercial Code (UCC), Ill.Rev.Stat. ch. 26 § 2-106 (1973), and that consequently there was no authority for Jones & Laughlin's warranty claims. In the alternative the court went on to hold that, even if the UCC did apply, Jones & Laughlin's warranty claims were time-barred. Johns-Manville's motion for summary judgment with respect to the remaining claims was denied.[3]
 
 
 9
 Trial before a jury commenced on November 27, 1978. At the close of the testimony, the district court denied a motion by Johns-Manville for a directed verdict on the tort claims. Johns-Manville had argued that, under Illinois law, a supplier of a product may not be held liable under tort principles for damages incurred as a result of the failure of the product to perform satisfactorily. Prior to the submission to the jury of the liability phase of the case, Jones & Laughlin withdrew its claim based on fraudulent misrepresentation.
 
 
 10
 In response to a series of special interrogatories, the jury found Johns-Manville liable on four of the remaining tort theories: (1) strict liability for defects in the roofing products; (2) strict liability for defects in the design of the roof; (3) strict liability for public misrepresentations regarding the roofing products; and (4) negligent performance of an undertaking to render services. In respect to one portion of the roof the valleys the jury attributed the injuries solely to the design defects and to Johns-Manville's negligence. No deterioration of the valleys was found to have been caused by the defective products or by Johns-Manville's public misrepresentations. The jury absolved Johns-Manville of liability for negligent misrepresentation and found that there was no breach of contract. In addition, the jury found Jones & Laughlin contributorily negligent in causing the injuries to the roof. In sum, the jury premised liability solely on Jones & Laughlin's tort claims, which were in turn predicated on strict liability, and rejected any contractual basis for recovery.
 
 
 11
 Trial then resumed on the question of damages. Jones & Laughlin claimed that it had expended over $1.7 million for repairs and would be required to spend between $2.9 million and.$3.2 million to repair and replace defective portions of the roof. The company did not seek damages for any injuries that may have occurred to its steel products, electrical equipment, or any property other than the roof itself. Because the damage to the valleys of the roof was found to have been caused only as a result of the design defects and Johns-Manville's negligence, the jury was instructed to make separate findings regarding the cost of valley repairs. The jury set the cost of the valley repairs at $625,000, and returned a verdict in favor of Jones & Laughlin in the total amount of $2 million.
 
 
 12
 Following entry of judgment by the district court, Johns-Manville moved for judgment notwithstanding the verdict and, alternatively, for a new trial. The district court denied both motions. Johns-Manville filed a timely appeal on February 5, 1979, and on February 16, 1979, Jones & Laughlin filed a timely cross-appeal.[4]
 
 II. DISCUSSION
 A. Choice of Law
 
 13
 A federal district court sitting pursuant to diversity jurisdiction must apply the choice of law rules of the state in which it is located.[5] Following Pennsylvania's "interest analysis/significant contacts" choice of law test,[6] the district court here concluded that a Pennsylvania state court would look to the law of Illinois for resolution of the substantive legal questions of this case. Inasmuch as the parties do not contest the choice of Illinois law, and because Illinois has both substantial interest in and close contact with the transactions at issue, we have no occasion to address the district court's decision in this regard.[7] Accordingly, our consideration of the substantive questions presented by these appeals will be guided by the law of Illinois.
 
 B. Johns-Manville's Appeal
 
 14
 As it did in the district court, Johns-Manville urges here that there is no cause of action under Illinois tort law against the seller of a product for the failure of the product to perform as it was expected, as distinguished from injuries to persons or other property caused by a defect in the product. In support of this position, Johns-Manville relies primarily on two cases decided by the intermediate appellate courts of Illinois.
 
 
 15
 In Rhodes Pharmacal Co. v. Continental Can Co., 72 Ill.App.2d 362, 219 N.E.2d 726 (1966), the plaintiff sued an aerosol can manufacturer for damages that resulted from the leakage of cans in which the plaintiff's product was packaged. The appellate court concluded that liability could be based on the existence of an implied warranty of fitness, but held that the plaintiff had no cause of action for strict tort liability. The court stated simply "we are not persuaded that the doctrine of 'strict tort liability' should be applied here." Id. at 368, 219 N.E.2d at 730.
 
 
 16
 More recently, in Alfred N. Koplin & Co. v. Chrysler Corp., 49 Ill.App.3d 194, 7 Ill.Dec. 113, 364 N.E.2d 100 (1977), the court extensively considered the justifications underlying the refusal to impose tort liability on a product manufacturer for the failure of its product to perform satisfactorily. The plaintiff had purchased two air conditioning units manufactured by Chrysler. When the units failed to work correctly, suit was brought against Chrysler for the costs of repairing and replacing the units. The jury found that (1) Chrysler had given the plaintiff an express warranty; (2) Chrysler negligently manufactured the products; and (3) the plaintiff was not contributorily negligent. After reviewing the record, the court concluded that Chrysler had expressly disclaimed any warranties of merchantability or fitness. It therefore reversed the verdict for the plaintiff based on the contract claim and turned to the question whether Illinois tort law provided a basis for recovery. Id. at 197, 7 Ill.Dec. at 116, 364 N.E.2d at 101-02. The court asserted that "this case falls within the narrow range of situations dividing tort theory from contract theory. This is so because the loss suffered by plaintiff in this case was 'economic' loss . . . ." Id. at 199, 7 Ill.Dec. at 116, 364 N.E.2d at 103. "Economic loss" was defined by the court as " 'damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property.' " Id. (quoting Note, Economic Loss in Products Liability Jurisprudence, 66 Colum.L.Rev. 917, 918) (emphasis added).[8] "The line of demarcation between physical harm and economic loss," the court declared, "reflects the line of demarcation between tort theory and contract theory." Id. at 199, 7 Ill.Dec. at 117, 364 N.E.2d at 104. It noted that the jurisdictions were divided on the question of tort recovery for economic losses, id. at 202, 7 Ill.Dec. at 119, 364 N.E.2d at 105-06 (citing cases), but chose to follow the lead of the Rhodes court and hold that a manufacturer is not liable under tort doctrines for the failure of its products to perform properly:
 
 
 17
 We conclude, as did the court, without analysis, in Rhodes, that tort theory (there strict liability, here negligence) does not extend to permit recovery against a manufacturer for solely "economic losses" absent property damage or personal injury from the use of the product.
 
 
 18
 Id. at 203, 7 Ill.Dec. at 120, 364 N.E.2d at 107. Accordingly, the judgment of the trial court was reversed in full.
 
 
 19
 As we observed just a short time ago, "the concept that a federal court must determine state law is somewhat misleading inasmuch as it implies the existence of a readily accessible and easily understood body of state law."[9] In those few instances in which the highest state court has recently addressed the precise question at issue in the occurrent action, the application of state law is readily achieved. The problem of ascertainment arises where, as here, the highest state court has not yet dealt with the issue at hand. Under these circumstances, it is the duty of the federal court to predict how the state's highest court would decide the question were it adjudicating the matter.[10] In order to make an accurate prediction of this kind, a federal court should examine all relevant sources of the pertinent state law including related decisions of the highest state court, decisions of the intermediate appellate courts, decisions of lower courts, scholarly treatises, Restatements of Laws, and germane law review articles.[11]
 
 
 20
 Inasmuch as the Supreme Court of Illinois has not addressed the question whether economic losses are recoverable under tort theories of liability, we cannot ascertain precisely the Illinois law on this subject. We are persuaded, however, that were the state supreme court to consider this question today, it would follow the decisions in Rhodes and Koplin, which find support in several well-reasoned discussions by other courts and commentators.[12]
 
 
 21
 About fifteen years ago, the Supreme Courts of New Jersey and California handed down the two landmark opinions in this area. In Santor v. A and M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965), the plaintiff purchased carpeting, that had been manufactured by the defendant, from a third-party seller. After several months, unsightly lines began to appear on the surface of the carpeting. The trial court determined that there was an implied warranty of fitness and concluded that the defendant breached the warranty. The Supreme Court of New Jersey affirmed and held that the plaintiff could maintain a breach of implied warranty claim directly against the manufacturer despite the lack of privity between them. In dicta, the court went on to declare that the plaintiff also possessed a cause of action for strict tort liability. It reasoned that, as with cases involving personal and property injuries caused by defective products, a manufacturer of an unsatisfactory product is better able to insure against and to spread the risk of economic losses than are individual consumers:
 
 
 22
 (W)hen the manufacturer presents his goods to the public for sale he accompanies them with a representation that they are suitable and safe for the intended use. . . . The obligation of the manufacturer thus becomes what in justice it ought to be an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves.
 
 
 23
 Id. at 64-65, 207 A.2d at 311-12.
 
 
 24
 Several months after Santor was decided, the California Supreme Court adopted a contrary position in Seely v. White Motor Co., 63 Cal.2d 9, 403 P.2d 145, 45 Cal.Rptr. 17 (1965). There, Seely purchased a truck manufactured by the defendant. Upon taking possession, Seely discovered that the truck bounced violently. Nine months later, the truck overturned. Seely, who was not injured, had the damage repaired and ceased making his installment payments on the truck. The defendant subsequently repossessed the truck. Seely sued on theories of breach of express warranty and strict tort liability, and sought damages for the repair of the truck, for money paid on the purchase price, and for lost profits occasioned by the unsuitability of the truck for normal use. The trial court denied the claim for damages for the cost of repair because it found that the plaintiff failed to prove that the defect caused the accident, but awarded the plaintiff damages for money paid on the purchase price and for lost profits.
 
 
 25
 The California Supreme Court, holding that the manufacturer was liable on the basis of the express warranty, affirmed. It rejected strict liability, however, on the ground that the economic loss involved the failure of the product to perform to the level of the party's expectations a concept that, for both traditional and practical reasons, is grounded essentially in the law of contracts, not the law of torts. Writing for the court, Chief Justice Traynor extensively analyzed the relationship between contract law and tort law:
 
 
 26
 The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the "luck" of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.
 
 
 27
 Id. at 18, 403 P.2d at 151-52, 45 Cal.Rptr. at 23-24, quoted in Koplin, 49 Ill.App.3d at 200-02, 7 Ill.Dec. at 118, 364 N.E.2d at 105.
 
 
 28
 In cases decided subsequently to Santor and Seely, a large majority of courts following Seely have held that economic losses are not recoverable under claims sounding in tort law.[13] As noted above, both Illinois appellate courts that have addressed the question adopted this rule. Indeed, the Koplin court specifically rejected Santor and instead relied heavily on Chief Justice Traynor's analysis in Seely. See 49 Ill.App.3d at 200-02, 7 Ill.Dec. at 117-19, 364 N.E.2d at 104-05.
 
 
 29
 The position adopted in Koplin and Rhodes also has been more favorably received by the commentators than was the Santor analysis.[14] Dean Prosser even went so far as to assert:
 
 
 30
 There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself, as where an automobile is wrecked by reason of its own bad brakes, as well as damage to any other property in the vicinity. But where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, or the cost of repairing it, the courts have adhered to the rule . . . that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery.[15]
 
 
 31
 Disallowance of tort claims for economic losses accords with the provisions of the Restatement (Second) of Torts that discuss a manufacturer's liability for negligence and for strict liability. Section 323 of the Restatement (Second), for example, which defines the liability of one who negligently performs an undertaking to render services, provides that a manufacturer is liable to persons using its products for "physical harm" caused by its negligence. Neither the rule nor its accompanying commentary and illustrations extends liability for negligence to encompass economic losses.[16] Similarly, §§ 402A and 402B, which establish respectively strict liability for defective products and misrepresentation in the sale of products, apply only where the product or misrepresentation causes physical harm to the user of the product. Nowhere in the accompanying commentary or illustrations do the reporters of the Restatement indicate that the doctrine of strict liability covers economic losses.[17] Indeed, comment d to § 402B strongly implies that the rule was not intended to overlap the provisions of the Uniform Commercial Code or the common law of sales, which traditionally provided the sole basis for recovery of economic losses: "The liability stated in this section is liability in tort, and not in contract; and if it is to be called one of 'warranty,' it is at least a different kind of warranty from that involved in the ordinary sale of goods from the immediate seller to the immediate buyer."[18]
 
 
 32
 Policy considerations also support the view that the Illinois Supreme Court would follow the decisions in Rhodes and Koplin. Courts have adopted strict liability for cases involving injury to persons or other property in order to place the cost of such injuries on the manufacturer the party best able to distribute the costs. Inasmuch as the defective product may well injure persons who have not purchased the product or in any way dealt with the manufacturer, there is no price mechanism by which to insure such persons against the risk of loss. As a consequence, there is no way effectively to internalize the product's true costs, which necessarily include the risk that some products will be defective and cause injury. The imposition on manufacturers of strict liability for defective products accomplishes the cost internalization that the price mechanism cannot achieve by placing the complete cost of the injuries on the manufacturer. In turn, the manufacturer can allocate a portion of that cost to the purchasers of its products in the form of higher prices.[19]
 
 
 33
 The rationale behind strict liability in personal injury situations is not well-suited to claims alleging only economic loss. Economic loss results from the failure of the product to perform to the level expected by the buyer and the seller. Such loss is most frequently measured by the cost of repairing the infirmity or by the difference in the value of the product as it exists and the value it would have had if it performed as expected.[20] Thus, economic loss is almost always incurred by the owner of the product, not by persons who merely use it or come into contact with it. The original purchaser, particularly a large company such as Jones & Laughlin, can protect itself against the risk of unsatisfactory performance by bargaining for a warranty. Alternatively, it may choose to forego warranty protection in favor of a lower purchase price for the product. Subsequent purchasers may do likewise in bargaining over the price of the product. In any event, because persons other than the owner of the product will not incur economic losses resulting from the product's poor performance, the costs associated with economic loss will likely be reflected in the price of the product. There accordingly would seem to be no need to internalize these costs through a non-price mechanism such as strict liability.
 
 
 34
 Finally, the extension of strict liability proposed here by Jones & Laughlin would appear to conflict with the decision by the Illinois Legislature to enact the sale provisions of the Uniform Commercial Code (UCC). Ill.Rev.Stat. ch. 26, §§ 2-101 to 2-725 (1973). Section 2-313 of the Code recognizes the existence of express warranties, and § 2-314 enacts an implied warranty of merchantability and fitness. Section 2-314 provides that "(u)nless excluded or modified . . ., a warranty that the goods shall be merchantable is implied in a contract for their sale." Id. § 2-314(1). To be merchantable, the goods, inter alia, must be "fit for the ordinary purposes for which such goods are used." Id. § 2-314(2)(c). The Code also provides, however, that the parties to a sales contract may agree that the buyer possesses no warranty protection at all, or may limit any warranties in any reasonable manner. Id. § 2-316. The parties may even agree to exclude the implied warranty of merchantability and fitness if they do so in writing, and may modify the implied warranty by clear and conspicuous language. Id. § 2-316(2).
 
 
 35
 The extension of strict liability to cover economic losses in effect would make a manufacturer the guarantor that all of its products would continue to perform satisfactorily throughout their reasonably productive life. Inasmuch as the doctrine of strict liability does not permit a manufacturer to limit its liability through the use of a waiver or a limited warranty,[21] importation of strict liability into the economic loss area would effectively supersede § 2-316 of the UCC. Yet, there is nothing in prior opinions of the Illinois Supreme Court to suggest that it would undertake such an encroachment on the legislative prerogative. As the Supreme Court of Idaho remarked recently in dealing with this very question:
 
 
 36
 (T)he legislatures of nearly every state in the Union, have adopted the UCC which carefully and painstakingly sets forth the rights between the parties in a sales transaction with regard to economic loss. This Court, in the common law evolution of the tort law of this state, must recognize the legislature's action in this area of commercial law and should accommodate when possible the evolution of tort law with the principles laid down in UCC.[22]
 
 
 37
 Consequently, we do not believe that the Illinois Supreme Court would extend its common law of tort liability in the manner suggested by Jones & Laughlin.
 
 
 38
 For the foregoing reasons, we predict that the Illinois Supreme Court would hold that economic losses are not recoverable under claims based on principles of tort law. The decisions of the intermediate Illinois appellate courts, the considered opinions of the vast majority of other courts and commentators who have addressed the matter, and reasons of public policy and judicial deference combine to support such a decision. Inasmuch as Illinois law does not permit a claim for economic loss to be premised on tort theories, we hold that Jones & Laughlin has not stated valid causes of action for strict liability or for negligence. Since we believe that the district court erred in denying Johns-Manville's motion for judgment notwithstanding the verdict, the judgment in favor of Jones & Laughlin will be reversed.
 
 C. Jones & Laughlin's Cross-Appeal
 
 39
 Jones & Laughlin has filed a cross-appeal that is conditional on our reversing the judgment in its favor. Inasmuch as we have reversed the judgment in its favor, we now turn to the claim by Jones & Laughlin that it is entitled to a new trial.
 
 
 40
 1. Jones & Laughlin's Breach of Warranty Claims Barred by the Illinois Statute of Limitations ?
 
 
 41
 The district court granted Johns-Manville's motion for summary judgment on Jones & Laughlin's claim for breach of express warranty and implied warranty of merchantability and fitness as defined by the UCC. Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 453 F.Supp. 527, 535 (W.D.Pa.1978). See Ill.Rev.Stat. ch. 26 §§ 2-313 & 2-314 (1973). The court first decided that, under Illinois law, a contract for the construction of a roof is not a contract for the sale of goods as required by the UCC. It reasoned that because Johns-Manville was employed not merely to supply the roofing materials, but also to assist in the design of the roof and to supervise construction, its relationship to Jones & Laughlin extended substantially beyond the buyer-seller arrangement contemplated by the UCC. 453 F.Supp. at 535-36.
 
 
 42
 Even if the contract at issue were governed by the UCC, the district court went on to hold that Jones & Laughlin's UCC claims would be time-barred.[23] The applicable statute of limitations, section 2-725 of the Code provides:
 
 
 43
 A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.
 
 
 44
 Jones & Laughlin concedes that delivery of the roof occurred more than five years prior to the filing of this lawsuit, but argues that the district court erred in holding that the contract between it and Johns-Manville did not explicitly extend any warranties to the future performance of the roof so that the cause of action accrued when the breach was or should have been discovered.[24] In support of this proposition, Jones & Laughlin points to literature given to it by Johns-Manville during the course of their preliminary negotiations. The literature states in part:
 
 
 45
 Johns-Manville has been producing roofing felts made of asbestos for over 100 years. On the record, Johns-Manville can cite many asbestos roofs that, today, are still performing satisfactorily after more than forty (40) years of exposure to heat, cold, water, air and even fire. And, all of this service with minimum maintenance and repair costs.
 
 
 46
 Improved Fesco Board resists the tensions, twists and pulls created by high winds, tornadoes, hurricanes and building movements. Laboratory tests, pictured here, demonstrate Improved Fesco Board's great tensile strength and outstanding resistance to diagonal shear and horizontal shear . . . Many roof insulations barely meet the Factual Mutual minimum requirements but Improved Fesco Board withstands 120 miles per hour winds with a 100% factor of safety.
 
 
 47
 We are not persuaded by Jones & Laughlin's proffered interpretation of the sales literature distributed by Johns-Manville. The statements regarding the strength and wind resistance of Fesco Board, as well as the boast that many roofs supplied by Johns-Manville "are still performing satisfactorily after more than forty (40) years" of use, may not reasonably be relied on by Jones & Laughlin as explicit extensions of any warranty to cover the future performance of the product, as is required by § 2-725(2).[25] Nor does knowledge by Johns-Manville of Jones & Laughlin's expectations, or the possible reliance by Jones & Laughlin on Johns-Manville's expertise, transform these representations regarding the performance of existing products, advanced in advertising brochures, into explicit warranties of future performance. Therefore, we hold that the district court did not err in refusing to apply the § 2-725(2) exception to the four year statute of limitations for claims based on the UCC. Because the statute commenced to run on the date the roof was delivered, August 30, 1967, the district court also did not err in holding that Jones & Laughlin's UCC claims, filed on August 7, 1972, were time-barred.[26]
 
 
 48
 Under these circumstances, there is no occasion for us to address the alternative ground relied on by the district court in granting summary judgment in favor of Johns-Manville on the UCC claims namely, that this was a construction contract which is not covered by the UCC.[27] Inasmuch as our resolution of this issue would neither be authoritative nor alter the outcome of this appeal, we decline to address it.
 
 
 49
 2. Were the Jury's Answers to the Special Interrogatories Inconsistent ?
 
 
 50
 At the conclusion of the trial, Jones & Laughlin moved for a new trial on its contract claims on the ground that it was inconsistent for the jury to conclude that Johns-Manville was negligent in its assistance in designing the roof and supervising construction, while also concluding that Johns-Manville did not breach its contractual duties in this regard. The district court denied this motion.
 
 
 51
 The interrogatories dealing with the negligence claim and the jury's answers read as follows:
 
 
 52
 13. Did Johns-Manville undertake to render any services to Jones & Laughlin which were necessary for the protection of Jones & Laughlin's property, where Johns-Manville failed to exercise reasonable care in performing those services?
 
 X
 
 53
 ------- -------
 
 Yes No
 
 54
 13A If your answer to # 13 is Yes, did Johns-Manville's failure to exercise reasonable care consist of preparing, devising, or creating any part of the plans and specifications for the roof?
 
 X
 
 55
 ------- -------
 
 Yes No
 
 56
 13B If your answer to # 13 is Yes, did Johns-Manville's failure to exercise reasonable care consist in review of approval of any portions of plans prepared by others, or in inspecting the works of others?
 
 X
 
 57
 ------- -------
 
 Yes No
 
 58
 In interrogatory 13-B, the use of the disjunctive "or" means that the jury's affirmative answer logically may represent its determination that Johns-Manville's failure to exercise reasonable care related either to reviewing or approving the plans, or to inspecting the work of others. In other words, the use of the disjunctive means that the jury did not necessarily find that Johns-Manville was negligent in regard both to reviewing the plans and inspecting the work.
 
 
 59
 Interrogatories 17 and 18, dealing with the existence and breach of the contract, stated:
 
 
 60
 17. Was there any agreement apart from the roof bond between Johns-Manville and Jones & Laughlin that in return for Jones & Laughlin's specification of Johns-Manville roofing products on the Hennepin mill, Johns-Manville would design a suitable built-up roofing system, recommend suitable materials for the roof, review the roofing plans and specifications, and/or inspect the work of construction?
 
 X
 
 61
 ------- -------
 
 Yes No
 
 62
 18. If your answer to # 17 is Yes, did Johns-Manville breach this agreement in a material way?
 
 X
 
 63
 ------- -------
 
 Yes No
 
 64
 Again, the use of the disjunctive "and/or" in interrogatory 17 permitted the jury to answer in the affirmative, even if it determined that Johns-Manville had promised only to perform one of the duties listed.
 
 
 65
 Hence, the responsibilities found to exist in the negligence and contract interrogatories were not necessarily the same. For example, the jury could have determined in the answers to interrogatories 13A and 13B that Johns-Manville was negligent in preparing the plans for the roof and in reviewing or approving plans prepared by others, but did not negligently fail to exercise reasonable care in inspecting the construction work performed by others. At the same time, in response to interrogatory 17, the jury might have concluded that Johns-Manville had promised only to inspect the construction work and did not breach this duty.
 
 
 66
 If there exists "a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way." Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962). Since there is at least one way to explain the jury's answers to the interrogatories, we are bound to affirm them. Absent a challenge to the sufficiency of the evidence, any other result would be at odds with the Seventh Amendment. Id. Accordingly, the district court did nor err in denying Jones & Laughlin's motion for a new trial.[28]
 
 III. CONCLUSION
 
 67
 Although today's decision may appear to be somewhat harsh, we are confident that it is the result required by Illinois law. The record establishes that the roof purchased by Jones & Laughlin was unsuitable for the weather conditions to which it was subject. The unsuitability or the failure of the roof to perform as anticipated by the parties does not give rise to a cause of action based on Illinois tort law. While it would appear that Jones & Laughlin did have a colorable breach of warranty claim under the UCC (assuming arguendo that the contract involved the sale of goods), the company did not file such a claim within the time limits specified by the Illinois statute of limitation. And, for reasons known only to the jurors themselves, the jury rejected Jones & Laughlin's contract claims. Whatever the equities may be, under these circumstances Jones & Laughlin simply no longer has a legally actionable claim for relief.
 
 
 68
 Accordingly, the judgment of the district court denying Johns-Manville's motion for a judgment notwithstanding the verdict will be reversed, and in all other respects the judgment will be affirmed.
 
 
 
 [1]
 Although the complaint filed in the Pennsylvania state court did not allege diversity jurisdiction, the removal petition clearly does so. Paragraph four states that Jones & Laughlin is a Pennsylvania corporation and resident, while Johns-Manville is a Delaware corporation and maintains its principal place of business in Colorado. Paragraph five recites that the amount in controversy exceeds $10,000. These allegations of diversity jurisdiction comport with the requirements of 28 U.S.C. § 1332 (1976). See Whitelock v. Leatherman, 460 F.2d 507, 514 (10th Cir. 1972): "A federal court's jurisdiction must clearly appear from the face of the complaint or removal petition."
 
 
 [2]
 Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 453 F.Supp. 527, 531-32, 535-37 (W.D.Pa.1978)
 
 
 [3]
 Id. at 535-41
 
 
 [4]
 As a result of our query to the parties prior to oral argument whether the order of the district court constituted a final judgment under 28 U.S.C. § 1291 (1976), the district court amended the judgment on January 31, 1980 to include a disposition of the claims involving the third-party defendants. All claims against them were granted in their favor
 
 
 [5]
 Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)
 
 
 [6]
 Cipolla v. Shaposka, 439 Pa. 563, 267 A.2d 854 (1970); Griffith v. United Airlines, Inc., 416 Pa. 1, 203 A.2d 796 (1964)
 
 
 [7]
 Steaks Unlimited v. Deaner, 623 F.2d 264, at 269-270 (3d Cir. filed Apr. 24, 1980); Pierce v. Capital Communications, Inc., 576 F.2d 495, 502 n.19 (3d Cir.), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978)
 
 
 [8]
 The court also included in its definition of "economic loss" the " 'diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.' " 49 Ill.App.3d at 199, 7 Ill.Dec. at 116, 364 N.E.2d at 103 quoting Note, Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages Tort or Contract?", 114 U.Pa.L.Rev. 539, 541 (1966)
 
 
 [9]
 McKenna v. Ortho Pharmaceutical Corp., 622 F.2d 657, at 661 (3d Cir. 1980)
 
 
 [10]
 Id. at 661, at 8 & n.15 (citing cases)
 In Commissioner v. Estate of Bosch, 387 U.S. 456, 565, 87 S.Ct. 1776, 1782-1783, 18 L.Ed.2d 886 (1967), the Supreme Court summarized the manner in which federal courts should go about defining state law:
 (W)hile the decrees of "lower state courts" should be "attributed some weight . . . the decision (is) not controlling . . ." where the highest court of the State has not spoken on the point. . . . "(A)n intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." . . . If there be no decision by (the State's highest court) . . . then federal authorities must apply what they find to be the state law after giving "proper regard" to relevant rulings of other courts of the State.
 (citations deleted; emphasis in original).
 
 
 [11]
 McKenna, supra, at 662-663
 
 
 [12]
 Earlier this year, in a case involving the Illinois law of sales, we reserved this specific question. Caisson Corp. v. Ingersoll-Rand Co., 622 F.2d 672, at 676-677 & n.1 (3d Cir. 1980)
 
 
 [13]
 See, e. g., Posttape Assoc. v. Eastman Kodak Co., 537 F.2d 751 (3d Cir. 1976) (Pennsylvania law; strict liability); Fredonia Broadcasting Corp. v. RCA Corp., 481 F.2d 781 (5th Cir. 1973) (Texas law; strict liability); Bright v. Goodyear Tire & Rubber Co., 463 F.2d 240 (9th Cir. 1972) (California law; intentional or reckless tort); Southwest Forest Indus., Inc. v. Westinghouse Elec. Corp., 422 F.2d 1013 (9th Cir.) (Arizona law; strict liability), cert. denied, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970); Midland Forge, Inc. v. Letts Indus., Inc., 395 F.Supp. 506 (N.D.Iowa 1975) (Iowa law; strict liability); Arizona v. Cook Paint & Varnish Co., 391 F.Supp. 962 (D.Ariz.1975) (under law of Arizona, California, Hawaii, Texas, or Alaska economic loss not recoverable in strict liability action), aff'd, 541 F.2d 226 (9th Cir. 1976); Cooley v. Salopian Indus. Ltd., 383 F.Supp. 1114 (D.S.C.1974) (South Carolina law; strict liability); Noel Transfer & Package Delivery Serv., Inc. v. General Motors Corp., 341 F.Supp. 968 (D.Minn.1972); Clark v. International Harvester Co., 99 Idaho 326, 581 P.2d 784 (1978) (negligence); Morrow v. New Moon Homes, Inc., 548 P.2d 179 (Alaska 1976) (strict liability); Nobility Homes, Inc. v. Shivers, 557 S.W.2d 77 (Tex.1977) (strict liability); Hiigel v. General Motors Corp., 190 Colo. 57, 544 P.2d 983 (1975) (strict liability); Hawkins Constr. Co. v. Matthews Co., Inc., 190 Neb. 546, 209 N.W.2d 643 (1973) (strict liability); Price v. Gatlin, 241 Or. 315, 405 P.2d 502 (1965) (strict liability); Inglis v. American Motors Corp., 3 Ohio St.2d 132, 209 N.E.2d 583 (1965) (negligence); Alfred N. Koplin & Co. v. Chrysler Corp., 49 Ill.App.3d 194, 7 Ill.Dec. 113, 364 N.E.2d 100 (1977) (negligence); Long v. Jim Letts Oldsmobile, Inc., 135 Ga.App. 293, 217 S.E.2d 602 (1975) (negligence); Beauchamp v. Wilson, 21 Ariz.App. 14, 515 P.2d 41 (1973) (strict liability); Anthony v. Kelsey-Hayes Co., 25 Cal.App.3d 442, 102 Cal.Rptr. 113 (1972) (strict liability and negligence); Rhodes Pharmacal Co. v. Continental Can Co., 72 Ill.App.2d 362, 219 N.E.2d 726 (1966). But see, e. g., Mead Corp. v. Allendale Mut. Ins. Co., 465 F.Supp. 355 (N.D.Ohio 1979) (Ohio law; strict liability); Berg v. General Motors Corp., 87 Wash.2d 584, 555 P.2d 818 (1976) (strict liability); City of La Crosse v. Schubert, Schroeder & Assoc., Inc., 72 Wis.2d 38, 240 N.W.2d 124 (1976) (strict liability); Iacono v. Anderson Concrete Corp., 42 Ohio St.2d 88, 326 N.E.2d 267 (1975) (strict liability); Cova v. Harley Davidson Motor Co., 26 Mich.App. 602, 182 N.W.2d 800 (1970) (strict liability)
 
 
 [14]
 See, e. g., Keeton, Torts, 23 Sw.L.J. 1 (1969); Prosser, The Fall of the Citadel, 50 Minn.L.Rev. 791 (1969); Comment Manufacturer's Responsibility for Defective Products: Continuing Controversy Over the Law to be Applied, 54 Calif.L.Rev. 1681 (1966); Note Manufacturers' Liability to Remote Purchasers for "Economic Loss" Damages Tort or Contract ?, 114 U.Pa.L.Rev. 539 (1966). But see, e. g., Note, Economic Loss in Products Liability Jurisprudence, 66 Colum.L.Rev. 917 (1966)
 
 
 [15]
 W. Prosser, Law of Torts § 101, at 665 (4th ed. 1971) (footnotes omitted)
 
 
 [16]
 Restatement (Second) of Torts § 323, at 135-39 (1965). The negligence claim that the jury decided against Johns-Manville was based on this theory
 
 
 [17]
 Id. §§ 402A & 402B, at 347-62. The strict liability claims on which the jury found against Johns-Manville were based on these theories. In Suvada v. White Motor Co., 32 Ill.2d 612, 210 N.E.2d 182 (1965), the Illinois Supreme Court adopted the definition of strict liability set forth in Restatement (Second)
 
 
 [18]
 Restatement (Second) of Torts § 402B, comment d, at 360 (1965)
 
 
 [19]
 The leading cases analyzing and adopting strict liability are Greenman v. Yuba Power Proc., Inc., 59 Cal.2d 57, 377 P.2d 897, 27 Cal.Rptr. 697 (1963); Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960); Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 150 P.2d 436 (1944) (Traynor, J., concurring)
 
 
 [20]
 Economic loss may also include any consequential damages attributable to the failure of the product to perform as expected
 
 
 [21]
 Restatement (Second) of Torts § 402A, comment m, at 355-56; § 402B, comment d, at 360 (1965)
 
 
 [22]
 Clark v. International Harvester Co., 99 Idaho 326, 335, 581 P.2d 784, 793 (1978) (footnote omitted). See Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective-Products Cases, 18 Stan.L.Rev. 974, 989-90 (1966):
 It is striking that those who would use tort law to protect consumers in defective-product cases do so with only the most cursory explicit recognition that there may already be a body of law directed toward regulating the rights of buyers and sellers, and a statutory body at that. The courts are operating at the border of an area considered by draftsmen at great length and framed in legislation arguably relevant to the cases before the courts. Yet, these judges appear either unaware of the merging of the tort and sales lines or else unwilling to consider the possible limitations legislation may impose on traditional judicial primacy in tort law. . . .
 At best, we have judicial lack of awareness of the possible relevance of sales law. At worst, we have open judicial defiance of apparent statutory commands.
 
 
 [23]
 At the hearing on the motion for summary judgment, Jones & Laughlin challenged the applicability of the Illinois statute of limitations. The district court, looking to Pennsylvania's choice of law rules, acknowledged that in most situations a Pennsylvania state court would apply its own statute of limitations. 453 F.Supp. at 531 (citing Freeman v. Lawton, 353 Pa. 613, 46 A.2d 205 (1946)). It noted, however, that the Pennsylvania Legislature had enacted an exception to this rule:
 When a cause of action has been fully barred by the laws of the state or country in which it arose, such bar shall be a complete defense to an action thereon brought in any of the courts of this Commonwealth.
 
 
 [12]
 Pa.Stat. § 39 (repeated effective June 27, 1978 by Act of July 9, 1976, P.L. 586, No. 142, § 25(b), reprinted in 42 Pa.Const.Stat.Ann. § 5521 rule)
 Some years ago, this Court held that the so-called Pennsylvania borrowing statute defines the cause of an action as arising "where as well as when the final significant event that is essential to a suable claim occurs." Mack Trucks, Inc. v. Bendix-Westinghouse Auto A. B. Co., 372 F.2d 18 (3d Cir. 1966). The district court, referring to this passage from Mack Trucks, held that the case was governed by the Illinois statute of limitations because the "final significant event" whether that be the construction of the roof or the occurrence or appearance of damage happened in that state. 453 F.Supp. at 531.
 Inasmuch as both Pennsylvania and Illinois have enacted in identical form the statute of limitations of § 2-725 of the UCC, there is no question on this appeal whether the district court correctly interpreted the Pennsylvania borrowing statute. See 12A Pa.Const.Stat.Ann. § 2-725 (Purdon Supp.1979); Ill.Rev.Stat. ch. 26, § 2-725 (1973).
 
 
 [24]
 Jones & Laughlin filed this action on August 7, 1972. Construction of the roof, which constitutes "delivery" for purposes of § 2-725, was completed on August 30, 1967. Jones & Laughlin argues that the earliest time it reasonably could have discovered the breach was December 1968 the date of the first "blow-off." The roof began to blister in November 1967, but at that time Johns-Manville assured Jones & Laughlin that blistering was not an abnormal condition and that the "entire roof was laying beautifully."
 
 
 [25]
 See Binkley Co. v. Teledyne Mid-America Corp., 333 F.Supp. 1183 (E.D.Mo.1971) (quoting Hvidsten v. Northern Pac. Ry. Co., 76 N.D. 111, 121, 33 N.W.2d 615, 619 (1948)), aff'd, 460 F.2d 276 (8th Cir. 1972), in which the district court, interpreting § 2-725, defined the term "explicit" as meaning "not implied merely or conveyed by implication; distinctly stated; plain in language; clear; not ambiguous; express; unequivocal." See also Harney v. Spellman, 113 Ill.App.2d 463, 465, 251 N.E.2d 265, 266 (1969), in which the court construed "explicit" as it is used in UCC § 2-401(2) as meaning "that which is so clearly or distinctly set forth that there is no doubt as to its meaning."
 
 
 [26]
 The district court noted that Jones & Laughlin's remaining common law contract claims were not barred by the Illinois statute of limitations applicable to them. Ill.Rev.Stat. ch. 83, § 16 (1973). Those claims, it will be recalled, were decided adversely to Jones & Laughlin. The jury found that Johns-Manville did not breach any contractual obligation it had entered into with Jones & Laughlin
 
 
 [27]
 See generally Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co., 532 F.2d 572 (7th Cir. 1976); Berry v. G. D. Searle & Co., 56 Ill.2d 548, 309 N.E.2d 550 (1974); Rosen v. DePorter-Butterworst Tours, Inc., 62 Ill.App.3d 762, 19 Ill.Dec. 743, 379 N.E.2d 407 (1978); Executive Centers of America, Inc. v. Bannon, 62 Ill.App.3d 738, 19 Ill.Dec. 700, 379 N.E.2d 364 (1978); J & R Elec. Div. of J. O. Mory Stores, Inc. v. Skoog Constr. Co., 38 Ill.App.3d 747, 348 N.E.2d 474 (1976)
 
 
 [28]
 Since there are no remaining claims upon which Jones & Laughlin may obtain relief, we have no occasion to consider its contention that the district court erred in one of its instructions to the jury